696 A.2d 556

JOHN KINSELLA, PLAINTIFF–RESPONDENT AND CROSS–
APPELLANT, v. MARY KINSELLA, DEFENDANT–
APPELLANT AND CROSS–RESPONDENT.

Argued December 2, 1996—Decided July 10, 1997.

284

*Cary B. Cheifetz* and *Michael C. Caulfield* argued the cause for appellant and cross-respondent (*Skoloff & Wolfe* and *Kummer, Knox, Naughton & Hansbury,* attorneys; *Mr. Cheifetz, Beatrice E. Kandell* and *Phyllis S. Klein,* on the briefs).

*Christopher P. Gengaro* and *Toby Solomon* argued the cause for respondent and cross-appellant (*Lentz & Gengaro* and *Mr. Solomon,* attorneys; *Mr. Gengaro, Ms. Solomon* and *David W. Lentz,* of counsel and on the brief).

The opinion of the Court was delivered by

STEIN, J.

This appeal presents the question whether the psychologist-patient privilege may be invoked by a patient to prevent discovery of psychotherapeutic treatment records in the context of three aspects of matrimonial litigation: a marital tort claim against the patient, an extreme cruelty claim for divorce by the patient, and a child custody dispute between the patient and his spouse.

I

Plaintiff John Kinsella and defendant Mary Kinsella married in May 1977 in New York City. The couple subsequently moved to Glen Ridge, New Jersey. Two children were born of the marriage: John, Jr. on April 6, 1982, and Anastasia on September 14, 1985.

In January 1992, plaintiff filed for divorce on the ground of his wife's extreme cruelty, dating from approximately 1986. Specifically, plaintiff alleged that defendant had been verbally abusive, that she would "fly into a rage for no reason," and that she had intentionally involved the children in the couple's arguments. Plaintiff also alleged that defendant had spent excessive time with a male friend and that she had devoted too much time to her interior design business. Further, plaintiff alleged that defendant had alienated family and friends by her "bizarre behavior." Plain-

tiff sought dissolution of the marriage, custody of the children, and equitable distribution of the marital property.

In March 1992, defendant filed an answer and counterclaim, denying extreme cruelty on her part and alleging extreme cruelty on the part of the plaintiff, commencing with the birth of the couple's son in 1982. Defendant alleged that plaintiff had undergone a change of character due to heavy use of alcohol and illegal drugs. She alleged a pattern of belittling and humiliating behavior by plaintiff towards her, both at home and in public. Defendant further alleged that plaintiff had verbally and physically abused her and the children on a number of occasions. One such episode allegedly had resulted in a miscarriage. On another occasion, allegedly resulting in defendant's hospitalization, she asserted that the couple's six-year-old son had intervened by hitting plaintiff with a chair, allowing defendant to flee and call the police. Defendant sought dissolution of the marriage, custody of the children, equitable distribution of the marital property, alimony and child support, as well as court costs and counsel fees. Defendant also sought compensatory and punitive damages for injuries set forth in the counterclaim.

The parties proceeded with discovery and with settlement negotiations. Defendant retained physical custody of the children. In the fall of 1992, the designated motion judge appointed a psychologist, Sharon Ryan Montgomery, Psy.D., to assist in determining whether plaintiff should have overnight visitation with the children. Dr. Montgomery's report was completed on July 7, 1993. She is expected to testify at trial.

Before rendering her fourteen-page report, Dr. Montgomery had met four times with each parent individually, once with each child individually, and once with each parent together with the children. Her report included summaries of these interviews. Dr. Montgomery had also consulted with Madelyn S. Milchman, Ph.D., from whom the Kinsellas briefly had received therapy as a couple beginning in 1988 and from whom plaintiff continued to receive therapy on an individual basis. Dr. Montgomery did not

include notes from that consultation in her report. In addition, Dr. Montgomery apparently had reviewed a court-ordered addiction evaluation of plaintiff. Dr. Montgomery had not consulted with defendant's therapist, with John Jr.'s therapist, or with the family therapist treating the children and defendant.

According to Dr. Montgomery's report, defendant reported to Dr. Montgomery that plaintiff had had a drinking problem and had been physically abusive to both her and the children. She stated that the children were very fearful of their father and did not want to visit with him overnight. Defendant wanted plaintiff to have only very limited visitation. She also stated that she did not want plaintiff to have input into decisions regarding the children's welfare because she did not think that he and she could agree.

Plaintiff, on the other hand, admitted to Dr. Montgomery that he had been volatile and abusive with his wife at times, but claimed that she exaggerated the behavior. Plaintiff also admitted use of cocaine until November 1991 and excessive use of alcohol, but stated that his alcohol use diminished after he had decided to leave the marriage and that he currently did not suffer from an alcohol problem. That conclusion was confirmed to Dr. Montgomery by the addiction evaluation. Plaintiff denied physical abuse of his children, although he acknowledged that the children were somewhat frightened of him. He stated that he wanted regular, including overnight, visitation.

The children indicated to Dr. Montgomery that their father had hit them in the past and that they had witnessed their father being physically abusive to their mother. John Jr. stated that he wanted his father to refrain from drinking during visitation. He also was aware of his father's prior drug use. The psychologist's impression, however, was that the children were not as frightened of their father as their mother had described. She felt that some of John Jr.'s statements sounded rehearsed.

Dr. Montgomery recommended overnight visitation on alternate weekends and mid-week dinners for plaintiff with his children.

She concluded that plaintiff did not appear to be a compulsive user of drugs or alcohol at that time. However, she recommended continued urine screening on a sporadic basis for the next year and that plaintiff refrain from drinking during visitation. Dr. Montgomery recommended continued psychotherapy for both plaintiff and defendant. Dr. Montgomery also recommended that the court appoint a mediator/monitor to work with the Kinsellas to develop a co-parenting plan, supervise visitation and address further issues as they arose.

In July 1994, the court appointed Jeffrey P. Weinstein, Esq., to "work out a custody and visitation agreement with the parties." On October 18, 1994, Mr. Weinstein submitted his report, stating that he was unable to work out a custody agreement but proffering recommendations to the court. He is also expected to testify at trial.

In his report, Mr. Weinstein stated that he had read a letter to the court from Dr. Montgomery dated June 22, 1994. In addition, he had read a July 15, 1994, report by James G. Garofallou, Ph.D., from whom John Jr. had been receiving therapy. Mr. Weinstein had met with the Kinsella family and with the parents' attorneys. He had also spoken on the telephone to Dr. Montgomery, Dr. Garofallou, Dr. Milchman and defendant's therapist, Dr. Oosting.

Mr. Weinstein reported that he believed that defendant was manipulating the children, especially John Jr., to give the impression that their father was more dangerous than he really was. Nevertheless, he reported that the children had indicated that their father hit them in the past and continued to yell at them, and that they knew about his drug use. Mr. Weinstein stated that the treating therapists for the parents had both been "real advocates for the positions of their clients," and that both had believed that their clients were good parents. Dr. Garofallou had stated that he thought John Jr. was truly afraid of his father, but that because John Jr. would not allow Dr. Garofallou to meet his father, Dr. Garofallou had no independent opinion about plaintiff. Dr. Garofallou agreed with Mr. Weinstein that John Jr. might have been

repeating to Mr. Weinstein what he thought his mother wanted him to say. Mr. Weinstein reported: "I believe that John Jr. may be truly fearful of his father, but I do not believe that his father is the cause of the fear."

Mr. Weinstein recommended joint legal custody, with defendant having primary physical custody and plaintiff having alternate weekend visitation, plus one week night per week, and three weeks of vacation per year, plus alternate holidays. Mr. Weinstein reported that defendant would not agree to joint legal custody. The parties apparently did not agree on a visitation schedule either. Defendant also wanted plaintiff to submit to drug and alcohol testing, to which plaintiff suggested he might agree.

On January 15, 1995, defendant, who had obtained new counsel, filed an amended answer and counterclaim. The first count of the counterclaim again sought divorce on the ground of extreme cruelty, but contained more detailed factual allegations than the original counterclaim. Defendant alleged that plaintiff's physical and sexual abuse of her had dated from the beginning of the marriage in 1977, and that plaintiff had had a severe drinking problem from that time. Defendant also alleged that plaintiff had begun using cocaine in 1985.

Defendant alleged many specific instances of physical abuse against her and her children. She alleged that plaintiff had once severely injured her arm by twisting it in an attempt to make her drop her baby. She alleged that even before their son was one year old, plaintiff had frequently struck him and that, throughout his residence in the home, plaintiff had continued to kick and punch the child. She alleged that plaintiff had once sat on the couple's five-year-old daughter to make her stop crying. Other instances of alleged abuse against defendant included striking, dragging, choking, kicking and cutting her, throwing objects at her, and attempting to run her over with a car. Defendant also alleged that plaintiff had tortured her with razor blades and a leather whip and that he had threatened both her and her son

with knives and baseball bats. She alleged that plaintiff had refused to help her obtain critical medical assistance when she was suffering from a dangerous kidney infection related to her diabetic condition, and that he had attempted to force her to ingest overdoses of her medications. Defendant stated that she had lived in an attitude of constant fear and had contemplated suicide. Defendant alleged that plaintiff had threatened to kill her and had tried to convince her to kill herself.

Defendant claimed that she had been hospitalized in connection with some of those incidents, had required several surgeries, and continued to suffer medical consequences. She also claimed to have fled on one occasion to a Rhode Island hotel with her children. Defendant further alleged that plaintiff had been arrested in connection with incidents of abuse and had been the subject of a restraining order.

Defendant alleged that plaintiff's threats and abuse had continued after the separation. She alleged that, during visitation, plaintiff had once tied a rope around John Jr.'s neck and that Anastasia had returned from visitation with suspicious bruises. She also alleged that plaintiff had entered the marital home and broken the third floor windows. Additionally, defendant alleged that plaintiff had hired men to stalk and terrorize her.

On the first count, defendant sought dissolution of the marriage, custody of the children, alimony, child support, equitable distribution of the marital property, and court costs and counsel fees. The other counts of the counterclaim sought compensatory and punitive damages, as well as costs and counsel fees, for intentional assault and battery, intentional infliction of emotional distress, and marital tort claims. Defendant also submitted jury demands on those counts.

The parties proceeded towards trial. In a cross-motion filed in March 1995, plaintiff sought, *inter alia,* an order compelling defendant to sign releases for her medical and psychological records. The court granted that aspect of the cross-motion, but ordered the parties to agree on a form of order. No agreement

was reached before a subsequent pre-trial hearing on May 12, 1995. At that hearing, defendant contended that the order should provide for each party to have access to all of the other party's psychological records, including the records of plaintiff's treating psychologist, Dr. Milchman. Plaintiff objected to release of those records. Defendant argued that she sought the records on the issue of legal custody and because of "the issue ... of anger and fault that is pervading this case." Defendant also stated that she disagreed with the conclusions of the court-appointed psychologist, Dr. Montgomery. Plaintiff claimed that his psychological records were protected by the psychologist-patient privilege under *Rule 505* of the *Rules of Evidence*. He also represented that he did not intend to call Dr. Milchman as a witness at trial.

The trial court concluded that its earlier decision had not addressed plaintiff's records and therefore issued an order for release of defendant's records only. That order has not been appealed. The court gave the parties additional time to brief the question whether plaintiff also should be required to release his psychological records.

In her letter brief, defendant stated that she believed that plaintiff had revealed to his therapist a course of abusive conduct towards defendant. Defendant represented that she sought to review the therapist's records because of their relevance to the custody issues in the case as well as to the defendant's tort claim based on battered women's syndrome. Plaintiff objected to release of the records, claiming that physical custody was not an issue in the case, only joint legal custody, and that, in any event, Dr. Montgomery's report provided sufficient information on the mental state of plaintiff for purposes of the custody and visitation issues. Plaintiff further argued that, although defendant's psychological records were put at issue by her tort claims alleging her own psychological damages, plaintiff's mental state was not similarly at issue. Plaintiff asserted that, therefore, defendant could not overcome the psychologist-patient privilege to obtain his records.

The Family Part ordered each party to sign authorizations releasing their respective psychological records to opposing counsel. The court further ordered that the records might be reviewed by the parties themselves, but not released to them. In a letter to the parties dated May 23, 1995, the court explained:

> The Court feels that the release of the psychological records for both parties may be a consideration as to the question of the 'dangerousness' of this case and the unpredictability of future actions in any case.

> It is inherent that the Court be mindful of the effect which domestic violence or it's [sic] allegations has not only on past, but future relationships with the children. The Court believes that the mental health records of both parties should be available for review by the Court at the time of trial. The history or lack of history of abusive behavior should be know [sic] now in determining future custody arrangements.

The Appellate Division granted plaintiff's motion for leave to appeal from the interlocutory order. In his Appellate Division brief, plaintiff again argued that his treatment records were privileged and that the information sought was available from less intrusive sources. He attached the certification of his psychologist, Dr. Milchman, who stated:

> In my professional opinion, forcing me to produce my treatment notes and records, and possibly testify regarding my therapy sessions with Mr. Kinsella, will cause Mr. Kinsella to suffer severe anxiety and humiliation. Additionally, I am extremely concerned that such disclosures could damage my relationship with Mr. Kinsella, causing regression in his progress and undermine the therapeutic process. I am specifically concerned because if the substance of our conversations are [sic] revealed and used in the divorce proceeding, Mr. Kinsella will likely be far more cautious and far less candid with me in future therapy sessions out of fear that whatever he says may be revealed to the outside world and used against him.

In defendant's Appellate Division brief, she again argued that the records were needed in order for the court to determine custody and in order for her to prove the marital tort case. Defendant also argued that *Rule* 505 contains an exception for actions "to recover damages on account of conduct of the psychologist's client which constitutes a crime." In addition, defendant raised for the first time the contention that plaintiff put his mental state at issue by pleading extreme cruelty as the ground for divorce.

In its opinion, the Appellate Division rejected defendant's contention that the psychologist-patient privilege did not prevent disclosure of psychological records in the context of the custody or visitation dispute because the court must determine the "best interests of the child," noting that the welfare of the child is at stake in every such case. 287 *N.J.Super.* 305, 311–12, 671 *A.*2d 130 (1996). The Appellate Division stated that there were less intrusive means available for defendant to prove her claims of spousal abuse. *Id.* at 315–16, 671 *A.*2d 130. The Appellate Division also rejected defendant's interpretation of *Rule* 505 as providing an exception to the privilege in these circumstances. *Id.* at 316, 671 *A.*2d 130.

However, the Appellate Division agreed with defendant that, by pleading extreme cruelty as a cause of action in divorce, plaintiff had put his own mental condition at issue and therefore waived the psychologist-patient privilege. *Id.* at 317, 671 *A.*2d 130. Satisfying the statutory definition of extreme cruelty, the panel reasoned, "may require proof of the effect which the defendant's conduct has had on the plaintiff's state of mind." *Ibid.* Therefore, the Appellate Division held that defendant should have access to plaintiff's psychological records in order to answer plaintiff's allegations of extreme cruelty. Because plaintiff's waiver was limited to those claims, the Appellate Division limited the access "to records approximately contemporaneous with the period during which [plaintiff] alleges his wife committed the acts of extreme cruelty upon which he relies, with some latitude, however, to explore whether the psychological condition which he attributes to acts of extreme cruelty existed prior to their alleged commission." *Ibid.* Moreover, the Appellate Division required that the records in question first be reviewed *in camera* by the trial judge for relevancy before release to defendant or defense counsel. *Ibid.* The Appellate Division also stated that the trial court should place reasonable conditions on the use or further release of the records. *Ibid.*

Both parties filed motions for leave to appeal, which this Court granted. *See* 145 *N.J.* 369, 678 *A.*2d 711 (1996). The plaintiff appeals so much of the decision that holds that the psychologist-patient privilege is waived when a party sues for divorce based on extreme cruelty. Defendant appeals so much of the decision that holds that psychological records cannot be obtained for use in determination of custody issues and also contests denial of access to such records for purposes of her marital tort claim.

## II

A privilege against compelled disclosure of relevant evidence "runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth." *In re Selser,* 15 *N.J.* 393, 405, 105 *A.*2d 395 (1954). For that reason, in general, privileges are construed narrowly in favor of admitting relevant evidence. *State v. Schreiber,* 122 *N.J.* 579, 582–83, 585 *A.*2d 945 (1991). Nevertheless, the common law has recognized privileges against disclosure for certain types of communications, most notably those between attorney and client and between husband and wife; similarly, privilege traditionally has been extended by common law or statute to communications between government and informer, and between fellow jurors. *See* 8 *Wigmore on Evidence* § 2197, at 113–14 (McNaughton rev.1961); Developments in the Law, *Privileged Communications,* 98 *Harv. L. Rev.* 1450, 1456, 1592 (1985). Those communications privileges are generally considered to be premised on the following conditions: (1) the privileged communications originate in confidence; (2) confidentiality is an essential element of the proper relationship between the parties; (3) the relationship is one that the community wishes to encourage; and (4) the injury caused by damaging the relationship through disclosure of the communications would be greater than the benefit gained. *See Hague v. Williams,* 37 *N.J.* 328, 335, 181 *A.*2d 345 (1962); 8 *Wigmore, supra,* § 2285, at 527.

■ The privilege for communications between a patient and her psychotherapist is a more recent development in the law, but has been statutorily recognized in some form by all fifty states and the District of Columbia. *See Jaffee v. Redmond,* 518 *U.S.* ——, —— & n. 11, 116 *S.Ct.* 1923, 1930 & n. 11, 135 *L.Ed.*2d 337, 346 & n. 11 (1996) (listing statutes). The privilege has been defended on the basis of both constitutional privacy interests and its advancement of the patient-therapist relationship. *See Lora v. Board of Educ.,* 74 *F.R.D.* 565, 569–76 (E.D.N.Y.1977); *In re Lifschutz,* 2 *Cal.*3d 415, 85 *Cal.Rptr.* 829, 839–40, 467 *P.2d* 557, 567–68 (1970); *In re "B",* 482 *Pa.* 471, 394 *A.*2d 419, 423–26 (1978); 1 *McCormick on Evidence* § 72, at 270–71 (Strong ed., 4th ed.1992); Developments in the Law, *Privileged Communications, supra,* 98 *Harv. L.Rev.* at 1542–51. On the one hand, the psychotherapist-patient privilege protects the individual from public revelation of innermost thoughts and feelings that were never meant to be heard beyond the walls of the therapist's office. On the other hand, the privilege makes possible open and therefore productive relationships between therapists and patients, thereby advancing the public good accomplished when individuals are able to seek effective mental health counseling and treatment.

Recently, the United States Supreme Court held that a psychotherapist-patient privilege exists under *Rule* 501 of the *Federal Rules of Evidence,* which "authorizes federal courts to define new privileges by interpreting 'common law principles ... in the light of reason and experience.'" *Jaffee, supra,* 518 *U.S.* at ——, 116 *S.Ct.* at 1927, 135 *L.Ed.*2d at 343–44 (quoting *Fed.R.Evid.* 501). The Court based its conclusion in part on its perception that confidentiality "is a *sine qua non* for successful psychiatric treatment." *Id.* at ——, —— *U.S.* at —— – ——, 116 *S.Ct.* at 1928–29, 135 *L.Ed.*2d at 345 (quoting *Advisory Committee's Notes to Proposed Rules,* 56 *F.R.D.* 183, 242 (1972) (quoting Group for Advancement of Psychiatry, *Report No. 45, Confidentiality and Privileged Communication in the Practice of Psychiatry* 92 (June 1960))). The Court stated:

> Effective psychotherapy ... depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.
>
> [*Id.* at ——, 116 *S.Ct.* at 1928, 135 *L.Ed.*2d at 345.]

The Court found that the privilege afforded to psychotherapist-patient communications served the public interest "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Id.* at ——, 116 *S.Ct.* at 1929, 135 *L.Ed.*2d at 345.

In contrast, the Court found that only a modest benefit would be achieved by a rule favoring disclosure because the very communications to which litigants typically seek access would thereby be chilled. *Id.* at ——, 116 *S.Ct.* at 1929, 135 *L.Ed.*2d at 346. Patients are aware of the privilege and its limits because psychotherapists generally believe themselves to be ethically bound at the outset of the therapy relationship to inform their patients of the limits of confidentiality. *Id.* at —— n. 12, 116 *S.Ct.* at 1930 n. 12, 135 *L.Ed.*2d at 347 n. 12 (citing American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct* Standard 5.01 (Dec.1992), National Federation of Societies for Clinical Social Work, *Code of Ethics* V(a) (May 1988); American Counseling Association, *Code of Ethics and Standards of Practice* A.3.a (eff. July 1995)); *see also* American Psychiatric Association, *Task Force Report 31, Disclosure of Psychiatric Treatment Records in Child Custody Disputes* 4 (1991) (*Task Force Report*); National Association of Social Workers, *Code of Ethics* 1.07(e) (eff.Jan.1997). Therefore, in situations in which the patient knows that litigation is possible, the patient might well choose to limit what she says to her therapist or not seek therapy at all. Moreover, therapists who are aware of potential litigation may be reluctant to take or preserve notes. *See* Kathleen A. Hogan, *A Look at the Psychotherapist–Patient Privilege*, 14 *Fam. Advoc.* 31, 35 (1991).

The Supreme Court endorsed a strong version of the psycho-therapist-patient privilege that would not be contingent on a case-by-case balancing of the patient's interest in privacy with the evidentiary need for disclosure. The Court stated:

[I]f the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'

*[Jaffee, supra,* 518 *U.S.* at ——, 116 *S.Ct.* at 1932, 135 *L. Ed.*2d at 349 (quoting *Upjohn Co. v. United States,* 449 *U.S.* 383, 393, 101 *S.Ct.* 677, 684, 66 *L. Ed.*2d 584, 593 (1981)).]

New Jersey's psychologist-patient privilege is delineated in *Rule* 505 of the *Rules of Evidence,* which incorporates the relevant section of the Practicing Psychology Licensing Act of 1966. *See L.* 1966, *c.* 282, §§ 1–32 (codified at *N.J.S.A.* 45:14B–28). The Act was amended in 1981 to include the communications of "couples, families [and] groups" within the privilege. *See L.* 1981, *c.* 303, § 1. A 1994 amendment added specific exceptions to the privilege. *See L.* 1994, *c.* 134, § 11. *Rule* 505 currently provides:

The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as those provided between attorney and client, and nothing in this act shall be construed to require any such privileged communications to be disclosed by any such person.

There is no privilege under this section for any communication: (a) upon an issue of the client's condition in an action to commit the client or otherwise place the client under the control of another or others because of alleged mental incompetence, or in an action in which the client seeks to establish his competence or in an action to recover damages on account of conduct of the client which constitutes a crime; or (b) upon an issue as to the validity of a document as a will of the client; or (c) upon an issue between parties claiming by testate or intestate succession from a deceased client.

■ As the text of the statute indicates, the Legislature chose to model the psychologist-patient privilege on the privilege protecting communications between an attorney and her client.[1] *See*

---

[1] New Jersey is among several states whose privilege statutes model the psychotherapist-patient privilege on attorney-client privilege. *See* Guernsey, *supra,* 26 *Vill. L.Rev.* at 962 & n. 40. Other jurisdictions have modeled the

*Arena v. Saphier,* 201 *N.J.Super.* 79, 87, 492 *A.2d* 1020 (App.Div. 1985). The attorney-client privilege, which has long existed in New Jersey common law, *see In re Advisory Opinion No. 544,* 103 *N.J.* 399, 405–06, 511 *A.2d* 609 (1986); *Fellerman v. Bradley,* 99 *N.J.* 493, 498, 493 *A.2d* 1239 (1985), was legislatively enacted in 1960, *see L.* 1960, *c.* 52, § 20 (codified at *N.J.S.A.* 2A:84A–20). It is incorporated in *Rule* 504 (formerly *Rule* 26) of the *Rules of Evidence.* Like the psychologist-patient privilege, the attorney-client privilege can be explained by a functional rationale—"the judicial recognition that the public is well served by sound legal counsel based on full and candid communication between attorneys and their clients." *Fellerman, supra,* 99 *N.J.* at 502, 493 *A.2d* 1239.

■ The attorney-client privilege is not absolute. "[C]onsiderations of public policy and concern for proper judicial administration have led the legislature and the courts to fashion limited exceptions to the privilege. These exceptions attempt to limit the privilege to the purposes for which it exists." *Ibid.* An example is the exception for communications in the aid of a crime or fraud, which existed at common law and is also explicitly provided for in the statute. *See id.* at 503, 493 *A.2d* 1239; *N.J.R.E.* 504(2)(a); *see also In re Nackson,* 114 *N.J.* 527, 532–37, 555 *A.2d* 1101 (1989) (interpreting "crime or fraud" exception). The "crime or fraud" exception corresponds to an affirmative duty on the part of the attorney to disclose certain confidential communications in specific

psychotherapist-patient privilege on physician-patient privilege. *See id.* at 962 & n. 35.

In New Jersey, the statutory physician-patient privilege is somewhat more circumscribed than the psychologist-patient privilege. *See N.J.R.E.* 506 (incorporating *N.J.S.A.* 2A:84A–22.1 to .7); *State v. L.J.P.* 270 *N.J.Super.* 429, 439, 637 *A.2d* 532 (App.Div.1994); *State v. McBride,* 213 *N.J.Super.* 255, 270, 517 *A.2d* 152 (App.Div.1986); *Arena v. Saphier,* 201 *N.J.Super.* 79, 86, 492 *A.2d* 1020 (App.Div.1985).

The statutory marriage and family therapist privilege, on the other hand, may be somewhat broader than the psychologist-patient privilege. *See N.J.R.E.* 510 (incorporating *N.J.S.A.* 45:8B–29); *infra* at 305, 696 *A.2d* at 571.

situations. *See In re Abrams,* 385 *F.Supp.* 1210, 1211–12 (D.N.J. 1974), *rev'd on other grounds* 521 *F.*2d 1094 (3d. Cir.1975); *R.P.C.* 1.6.

In some circumstances, the attorney-client privilege may be overridden to compel disclosure, even in the absence of an explicit statutory or traditional categorical exception. However, as this Court stated in *In re Kozlov,* 79 *N.J.* 232, 243–44, 398 *A.*2d 882 (1979), three "foundations" must be established by the party seeking to pierce the privilege: (1) there must be a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) by a fair preponderance of the evidence, the party must show that the information cannot be secured from any less intrusive source. In *Kozlov,* this Court reversed the contempt conviction of an attorney for refusing to reveal the identity of a client who had given him information regarding a biased juror in an unrelated case, holding that the criteria for piercing the attorney-client privilege were not satisfied because the ultimate information sought—evidence about whether the juror was biased—was available from less intrusive sources. *Kozlov, supra,* 79 *N.J.* at 244, 398 *A.*2d 882; *see also Nackson, supra,* 114 *N.J.* at 537–39, 555 *A.*2d 1101 (holding that trial court should have balanced interests under *Kozlov* to determine whether attorney was required to disclose fugitive client's location).

Cases applying *Kozlov* have generally upheld the attorney-client privilege. *See Roe v. Roe,* 253 *N.J.Super.* 418, 433, 601 *A.*2d 1201 (App.Div.1992) (upholding attorney-client privilege to prevent discovery of diary kept on advice of counsel by plaintiff in action under Prevention of Domestic Violence Act, because defendant had made no showing that he could not obtain information from less intrusive source); *In re Grand Jury Subpoenas,* 241 *N.J.Super.* 18, 32, 574 *A.*2d 449 (App.Div.1989) (upholding privilege to prevent disclosure of communications between Sussex County Board of Freeholders and its attorneys, on basis that grand jury had not exhausted other means of obtaining information); *In re Maraziti,* 233 *N.J.Super.* 488, 498–500, 559 *A.*2d 447 (App.Div.

1989) (upholding attorney-client privilege to prevent disclosure of communications between minors and appointed law guardian sought by defendant father charged with sexual abuse, because alternative information source regarding children's credibility available); *In re State Comm'n of Investigation*, 226 *N.J.Super.* 461, 464, 544 *A.2d* 893 (App.Div.) (upholding attorney-client privilege to prevent disclosure of communications between New Jersey School Boards Association and its attorneys), *certif. denied*, 113 *N.J.* 382, 550 *A.2d* 484 (1988). *But see Leonen v. Johns–Manville*, 135 *F.R.D.* 94 (D.N.J.1990) (applying *Kozlov* and holding that privilege was pierced where documents containing attorney-client communications dating back to 1930s contained information that was no longer available from other sources concerning when manufacturer became aware of dangers of asbestos).

The typical setting in which the attorney-client privilege has not been sustained under *Kozlov* is where the party claiming the privilege has implicitly waived it by putting the confidential communications "in issue" in the litigation. Most jurisdictions recognize implicit waiver of the attorney-client privilege "where the plaintiff has placed in issue a communication which goes to the heart of the claim in controversy." Developments in the Law, *Privileged Communications, supra*, 98 *Harv.L.Rev.* at 1637–38; *see* 81 *Am.Jur.2d Witnesses* § 348, at 323 (1992). "In issue" waiver of the attorney-client privilege was addressed by the Appellate Division in *United Jersey Bank v. Wolosoff*, 196 *N.J.Super.* 553, 563–68, 483 *A.2d* 821 (App.Div.1984). In that case, a bank sued for rescission of a settlement agreement, claiming that a defaulting borrower had misrepresented his available assets during settlement negotiations. *Id.* at 558–59, 483 *A.2d* 821. The borrower sought access to communications between the bank and its attorneys, apparently in order to rebut the bank's assertion that it relied on the borrower's representations. *Id.* at 559–60, 483 *A.2d* 821. The Appellate Division held that the attorney-client privilege was pierced under the tripartite test in *Kozlov*: the defendants had a need for the communications, they were relevant and material, and no less intrusive source was adequate. *Id.* at

565, 483 A.2d 821. The Appellate Division concluded by recognizing "the inherent inequity" that would result if the plaintiff were permitted "to use the privilege as a sword rather than a shield," and noting that "[t]he resulting half-truth that would be revealed might well be more disabling than a total distortion." *Id.* at 567, 483 A.2d 821.

Applying *Kozlov,* New Jersey courts have declined to treat the "in issue" doctrine as operating automatically based on the cause of action pled. Instead they have used *Kozlov*'s three-part test to limit the waiver in scope to that which is necessary to serve the "public interest," according to the facts of the case. *See In re Envtl. Ins. Actions,* 259 *N.J.Super.* 308, 318–19, 612 A.2d 1338 (App.Div.1992) (applying *Kozlov* and holding that plaintiff in declaratory judgment action against insurers must disclose work-product related to underlying litigation only where defendants showed substantial need and undue hardship); *Weingarten v. Weingarten,* 234 *N.J.Super.* 318, 328, 560 A.2d 1243 (App.Div. 1989) (applying *Kozlov* and holding that wife waived attorney-client privilege to extent that her communications to her attorney were necessary to her husband's defense of her motion to vacate divorce settlement based on former husband's misrepresentations and to extent that information was not available elsewhere); *Blitz v. 970 Realty Assoc.,* 233 *N.J.Super.* 29, 37, 557 A.2d 1386 (App. Div.1989) (applying *Kozlov* and holding that plaintiff waived attorney-client privilege with regard to those communications relevant to her reliance on defendant's representations prior to and during real estate contract negotiations); *Wolosoff, supra,* 196 *N.J.Super.* at 567 and n. 3, 483 A.2d 821 (applying *Kozlov* and holding that plaintiff waived attorney-client privilege with regard to those documents relevant to plaintiff's claim that it had relied on defendant's attorney's representations during settlement negotiations).

Procedurally, in order to give effect to the attorney-client privilege under *Kozlov* without allowing the plaintiff to "invoke the privilege to render conclusive its own evaluation of the nature and character of the materials in question," courts may need to

conduct an *in camera* review of the materials claimed to be privileged. *See id.* at 568, 483 A.2d 821; *see also Jadlowski v. Owens–Corning Fiberglas Corp.,* 283 *N.J.Super.* 199, 217–18, 661 A.2d 814 (App.Div.1995) (providing for redaction of memorandum before admission), *certif. denied,* 143 *N.J.* 326, 670 A.2d 1066 (1996); *Envtl. Ins. Actions, supra,* 259 *N.J.Super.* at 319, 612 A.2d 1338 (providing for *in camera* inspection of documents for determination of privileged status); *Coyle v. Estate of Simon,* 247 *N.J.Super.* 277, 284, 588 A.2d 1293 (App.Div.1991) (approving of *in camera* review to determine which portions of attorney-client communication must be disclosed because party waived confidentiality when it called expert witness who relied on communications as basis for his opinion testimony).

This Court has not had the opportunity to address the scope of the psychologist-patient privilege. Other New Jersey courts confronted with the issue, however, consistently have applied the principles developed in the context of the attorney-client privilege. For example, an exception analogous to the "crime or fraud" exception to the attorney-client privilege has been recognized where the psychologist is *obligated* to make disclosures in order to respond to a "clear and present danger" to the patient or others. *See In re Rules Adoption Regarding Inmate–Therapist Confidentiality [N.J.A.C. 10A:16–4.4],* 224 *N.J.Super.* 252, 257–59, 540 A.2d 212 (App.Div.1988) (stating that psychologist-patient privilege yields to obligation of psychologists, under administrative code, ethical rules, and tort law, to disclose information in situations of "clear and imminent danger").

The "in issue" implicit waiver analysis developed in *Wolosoff* was expressly applied to the psychologist-patient privilege by the Appellate Division in *Arena, supra,* 201 *N.J.Super.* at 88–91, 492 A.2d 1020, to hold that the plaintiff had effected a limited waiver of the privilege by placing her emotional and mental state in issue in a medical malpractice action based in part on psychological distress. *See also Rosegay v. Canter,* 187 *N.J.Super.* 652, 657, 455 A.2d 610 (Law Div.1982) (holding that plaintiff waived psycholo-

gist-patient privilege, as well as physician-patient privilege, by claiming damages related to mental condition in dental malpractice action); B.W. Best, Annotation, *Privilege, in Judicial or Quasi–Judicial Proceedings, Arising from Relationship Between Psychiatrist or Psychologist and Patient,* 44 *A.L.R.*3d 24, 50, 59 (1972) (discussing statutory "patient-litigant" exceptions and judicially-created doctrine of implicit "in issue" waiver). The *Arena* panel correctly perceived that, just as in the context of attorney-client privilege, waiver of the psychologist-patient privilege by putting communications "in issue" does not function automatically or absolutely based on the pleading of a specific cause of action. *See Arena, supra,* 201 *N.J.Super.* at 89, 492 *A.*2d 1020. Instead, as in *Wolosoff,* the *Arena* panel applied the three-part *Kozlov* test to determine the scope of implied waiver. *See id.* at 90, 492 *A.*2d 1020. Similarly, as in *Wolosoff,* the *Arena* panel held that where the party seeking disclosure makes a *prima facie* case for waiver, the court should review the evidence *in camera* before releasing it, to ensure that the privilege is pierced only to the extent necessary. *Id.* at 90–91, 492 *A.*2d 1020.

Outside of the "in issue" implicit waiver context, the psychologist-patient privilege has been held to have been pierced in two other situations. First, in criminal proceedings, the psychologist-patient privilege may be required to yield to the defendant's right to exculpatory evidence. In *State v. McBride,* 213 *N.J.Super.* 255, 269–271, 517 *A.*2d 152 (App.Div.1986), the Appellate Division held that the standards articulated in *Arena, supra,* should have been applied to require limited disclosure of a report prepared by the complainant's psychologist. The panel stated that the trial court should have conducted an *in camera* review and disclosed any information in the report that would have been relevant to the victim's credibility and to the weight that should be accorded the expert witness's testimony. *Id.* at 271, 517 *A.*2d 152. The panel went so far as to suggest that "there even may be a Sixth Amendment and State constitutional right requiring the release of the report to defendant following an *in camera* review by the judge." *Id.* at 270, 517 *A.*2d 152; *see also State v. L.J.P.,* 270

*N.J.Super.* 429, 436–43, 637 *A.2d* 532, (App.Div.1994) (holding that psychologist-patient privilege must yield to right of defendant to impeach critical witness).

The psychologist-patient privilege also has been held to be pierced in a case requiring the court to conduct a "best-interests-of-the-child" analysis in the context of a child custody dispute. *See Fitzgibbon v. Fitzgibbon,* 197 *N.J.Super.* 63, 69, 484 *A.2d* 46 (Ch.Div.1984). That case, however, involved the results of tests administered by a court-appointed psychological expert who testified at trial, not the therapy records of a treating psychologist. *Ibid.*

### III

■ Preliminarily, we note that plaintiff apparently invokes the psychologist-patient privilege to prevent disclosure of all treatment records kept by Dr. Milchman that pertain to him. Some of the records that defendant seeks are records of therapy sessions that both plaintiff and defendant attended. In fact, defendant asserts that she has concrete knowledge that plaintiff made relevant admissions to his psychologist because she was there and she heard them.

By providing that the psychologist-patient privilege is coextensive with the attorney-client privilege, *Rule* 505 of the *Rules of Evidence* suggests that the privilege may be subject to an exception analogous to the traditional exception to the attorney-client privilege for communications made to an attorney at a time when the attorney was jointly employed by the parties now opposed. *See N.J.R.E.* 504(2).

■ We do not find it necessary to decide whether such an exception to the psychologist-patient privilege exists, however, because we find that, to the extent that the communications at issue in this appeal would come under such an exception, they are protected by the marriage and family therapist privilege rule, *N.J.R.E.* 510 (incorporating *N.J.S.A.* 45:8B–29). The marriage

and family therapist privilege extends to communications made to marriage counselors, whether or not the counselors are licensed as such. *See Wichansky v. Wichansky*, 126 *N.J.Super.* 156, 158–60, 313 *A.2d* 222 (Ch.Div.1973). Therefore, we have no difficulty making the factual determination necessary for this holding, even though the claim was not made below.

*Rule* 510 provides:

A communication between a marriage and family therapist and the person or persons in therapy shall be confidential and its secrecy preserved. This privilege shall not be subject to waiver, except where the marriage and family therapist is a party defendant to a civil, criminal or disciplinary action arising from the therapy, in which case, the waiver shall be limited to that action.

Thus, in contrast to the attorney-client privilege rule, the marriage and family therapist privilege rule makes it clear that one party may not force disclosure of communications made by another party at a time when both parties were engaged in common therapy. *See Touma v. Touma*, 140 *N.J.Super.* 544, 552–54, 357 *A.2d* 25 (Ch.Div.1976). The fact that a small part of the communications sought may be covered by the marriage and family therapist privilege instead of the psychologist-patient privilege does not affect our analysis of the other disclosure issues to be resolved in this appeal.

## IV

■ Defendant originally sought release of plaintiff's psychotherapy records for the purpose of her marital tort claim as well as for the purpose of the custody and visitation issue. Regarding the marital tort claim, defendant argued that she needed the records because, under *Giovine v. Giovine*, 284 *N.J.Super.* 3, 663 *A.2d* 109 (App.Div.1995), she was required to make a preliminary showing of seriousness of injury in order to qualify for a jury trial. In ordering the release, the trial court did not address independently the marital tort claim. *See supra* at 292, 696 *A.2d* at 564. The Appellate Division, on the other hand, held that the jury demand for the marital tort claim did not justify the disclosure of

plaintiff's psychotherapy records. 287 *N.J.Super.* at 316, 671 *A.*2d 130.

We note preliminarily that this court recently overruled the relevant aspect of *Giovine, supra,* in *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996). Parties are not required to present preliminary proofs of seriousness of injuries in order to qualify for a jury trial on a marital tort issue joined with a divorce action. *See id.* at 298, 678 *A.*2d 667. Whether a marital tort claim will be afforded a jury trial depends on whether there are dominant issues in the case, such as child welfare, support, and custody issues, that cannot be resolved adequately if the marital tort claim is severed, or whether "society's interest in vindicating a marital tort through the jury process is the dominant interest in the matter." *Id.* at 301–02, 678 *A.*2d 667. We will therefore consider the question whether the records of plaintiff's therapy are required for the ultimate proofs on the marital tort claims.

We also note that the Appellate Division correctly rejected defendant's assertion that a statutory exception to the psychologist-patient privilege makes that privilege unavailable to any defendant in an action to recover damages based on an act that constitutes a crime. As the Appellate Division stated, the relevant exception in *Rule* 505(a) makes the privilege unavailable *"upon an issue of the client's condition* ... in an action to recover damages on account of conduct of the client which constitutes a crime." Since plaintiff's condition is not at issue in defendant's action to recover damages, i.e., her marital tort claim, that exception does not apply. *See* 287 *N.J.Super.* at 316, 671 *A.*2d 130.

Where no statutory or other traditional exceptions to the privilege apply, the court should not order disclosure of therapy records, even for *in camera* review by the court, without a *prima facie* showing that the psychologist-patient privilege should be pierced under *Kozlov*'s tripartite test: (1) there must be a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) by a fair preponder-

ance of the evidence, the party must show that the information cannot be secured from any less intrusive source.

Because the trial court did not apparently rule on this issue, we reach our conclusions based on our own examination of the record. The information that defendant seeks in support of her marital tort claim consists primarily of plaintiff's admission to his therapist that he had beaten defendant. We first observe that admissions of criminal acts during psychotherapy are within the core of what is protected by the psychologist-patient privilege. *See Jaffee, supra,* 518 *U.S.* at ———–———, 116 *S.Ct.* at 1925–27, 135 *L.Ed.*2d at 341–43 (holding that communications between psychotherapist and police officer who entered counseling after fatally shooting man in course of her employment were privileged in suit for wrongful death stemming from shooting). Plaintiff is in the position of *defending* the tort claim, thus he cannot be said to have voluntarily put his mental condition "in issue." *Cf. Arena, supra,* 201 *N.J.Super.* at 81, 492 *A.*2d 1020 (holding that patient waived privilege by seeking damages for emotional distress). Nor does the assertion of privilege on this issue implicate the Sixth Amendment right of confrontation, or any other constitutional right that has been called to our attention. *Cf. L.J.P., supra,* 270 *N.J.Super.* at 443, 637 *A.*2d 532 (holding that defendant's right to confront his accuser compelled piercing psychologist-patient privilege); *McBride, supra,* 213 *N.J.Super.* at 270, 517 *A.*2d 152 (same). Therefore, the presumption against piercing the privilege for the purpose of this claim is strong.

Plaintiff's alleged admissions to his psychologist would satisfy the primary factual element of defendant's case, and they are clearly relevant and material to legal issues before the court. However, we agree with the Appellate Division that defendant has not satisfied the third prong of the *Kozlov* test, because "[t]he evidence for proving Ms. Kinsella's allegations of spousal abuse should be provable by her medical records, her testimony, the testimony of other fact witnesses, and the testimony of psychologists or psychiatrists retained or appointed to conduct appropriate

investigations for purposes of this case." 287 *N.J.Super.* at 315–16, 671 *A.2d* 130. Therefore, we hold that defendant has not established a *prima facie* case for piercing the psychologist-patient privilege sufficient to allow disclosure of the records for the purpose of this claim.

 Our holding should not be read to diminish in any way the seriousness of the problem of domestic violence or New Jersey's policy of providing for the civil prosecution of marital tort claims. *See Brennan, supra,* 145 *N.J.* at 298–300, 678 *A.2d* 667. We therefore emphasize that New Jersey's privilege rule is not absolute and that we do not foreclose the possibility that the psychologist-patient privilege might be appropriately pierced in order to allow a claimant to prove a marital tort case if the claimant could show that no adequate alternative source existed for relevant and material evidence necessary to that claim.

## V

On appeal, defendant argued for the first time that release of plaintiff's psychotherapy records was required because plaintiff had put communications in those records "in issue," and thus waived the psychologist-patient privilege, by pleading extreme cruelty as a ground for divorce. The Appellate Division agreed, holding that the records should be made available on that issue alone. 287 *N.J.Super.* at 316–17, 671 *A.2d* 130. Thus, the Appellate Division ordered that those records approximately contemporaneous with the period during which the alleged acts of extreme cruelty took place should be released to the trial court for *in camera* review and directed the trial court to determine which, if any, of those documents were relevant to plaintiff's claim and to release those records, after imposing reasonable conditions on their use or disposition. *Ibid.*

The facts put "in issue" by a claim of extreme cruelty are a function of the requisite elements of proof of that cause of action. The statutory provision for divorce on the ground of extreme cruelty reads:

Divorce from the bond of matrimony may be adjudged for the following causes heretofore or hereafter arising:

. . . .

c. Extreme cruelty, which is defined as including any physical or mental cruelty which endangers the safety or health of the plaintiff or makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant; provided that no complaint for divorce shall be filed until after 3 months from the date of the last act of cruelty complained of in the complaint, but this provision shall not be held to apply to any counterclaim;

[*N.J.S.A.* 2A:34–2.]

That provision as it currently exists is the result of a general overhaul and liberalization of the divorce laws accomplished in 1971. *See L.* 1971, *c.* 212, § 2; *Painter v. Painter,* 65 *N.J.* 196, 203–06, 320 *A.*2d 484 (1974). In drafting the new laws, the Legislature relied heavily on the report of the Divorce Law Study Commission (Commission), authorized by *L.* 1967, *c.* 57, as amended by *L.* 1968, *c.* 170 and *L.* 1969, *c.* 25. The Commission announced that a primary policy objective was "to make it legally possible to terminate dead marriages." *Final Report of the New Jersey Divorce Law Study Commission* 6 (1970) (*Final Report* ). The Commission therefore recommended the establishment of a "no-fault" ground for divorce based on a period of separation. *Ibid.* Similarly, the Commission recommended abolition of all defenses to divorce based on mutual fault. *Ibid.* The Commission declined to advocate at that time the complete elimination of fault as a consideration in the law of divorce; rather, it recommended retaining some fault-based grounds, including extreme cruelty, and also stated that fault could continue to be considered in making alimony and child support determinations. *Id.* at 6–8. However, the report demonstrates that an effort had been made "to move away from the concept of fault on the part of one spouse as having been solely responsible for the marital breakdown, toward a recognition that in all probability each party has in some way and to some extent been to blame." *Painter, supra,* 65 *N.J.* at 205, 320 *A.*2d 484.

Revisions to the provision for divorce on the ground of "extreme cruelty" were an important part of the Commission's recommenda-

tions. That cause of action was first adopted in 1923. *See L. 1923, c.* 187, § 1. The term came to be judicially defined as "that degree of cruelty, either actually inflicted or reasonably inferred, which endangered the life or health of the aggrieved party, or rendered his or her life one of such extreme discomfort and wretchedness as to incapacitate him or her physically or mentally from discharging the marital duties." *Scalingi v. Scalingi,* 65 *N.J.* 180, 183, 320 *A.*2d 475 (1974); *see Zehrer v. Zehrer,* 5 *N.J.* 53, 58, 73 *A.*2d 911 (1950). The Commission blamed the "current rigidity of New Jersey divorce law" in large part on that narrow definition. *Final Report, supra,* at 68. Therefore, the Commission recommended the current statutory definition, which includes behavior that "makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant." *Id.* at 67–68. The Commission explained that definition as follows:

> The above definition constitutes an effort to modernize the concept of cruelty in a moderate fashion. It is broad enough to cover serious marital misconduct which endangers health or safety, *or* makes it improper or unreasonable to expect continued cohabitation. The terms are flexible but do not include trivial misconduct or ordinary contretemps. Minor frictions or frustrations, such as nagging or bullying, would not suffice unless in the aggregate when combined with other misconduct the cumulative effect endangers health or makes the relationship so intolerable that further cohabitation cannot reasonably be expected.
>
> An attempt is made to focus upon the effect of extreme cruelty upon the plaintiff, rather than upon the defendant's *mens rea* or intent to inflict pain. The result, insofar as the plaintiff is concerned, is the same whether the "cruelty" is calculated and designed or a by-product of the defendant's self-centeredness. Moreover, the result to the marriage relationship may be the same regardless of the defendant's motives. The focus should be upon what the misconduct has done to the marriage, not on punishing the defendant.
>
> [*Id.* at 69.]

The Commission also stated that the phrase "improper or unreasonable" was purposely vague and intended to be adapted to community standards of marital misconduct as they evolve. *Id.* at 70. In interpreting the 1971 revisions, this Court has confirmed that they "substantially broaden[ ] the concept of extreme cruelty as it existed under the earlier statute." *Scalingi, supra,* 65 *N.J.* at 183, 320 *A.*2d 475.

Even prior to the 1971 revisions, the standard for proving extreme cruelty had an important subjective element. The test has been stated to focus on three factors: (1) the acts of the defendant; (2) the intent of the defendant; and (3) the effect on the plaintiff. *See Friedman v. Friedman*, 37 *N.J.Super.* 52, 58, 116 *A.*2d 793 (App.Div.), *certif. denied*, 20 *N.J.* 135, 118 *A.*2d 559 (1955). The third factor was accorded special significance. *See Melia v. Melia*, 94 *N.J.Super.* 47, 50, 226 *A.*2d 745 (Ch.Div.1967) ("The touchstone of extreme cruelty is its impact upon the victim."). After the 1971 revision, it became even clearer that the subjective experience of the plaintiff, rather than the objective quality of the acts complained of, was determinative. *See Devito v. Devito*, 136 *N.J.Super.* 580, 583, 347 *A.*2d 375 (Ch.Div.1975) ("[T]he court finds that the revised statutory language has broadened the concept of extreme cruelty and indicates that the test as to whether there is sufficient evidence to support the 'cruelty' allegation is a subjective one."). A 1977 case illustrates this trend. In *Gazzillo v. Gazzillo*, 153 *N.J.Super.* 159, 379 *A.*2d 288 (Ch.Div. 1977), the court applied the subjective standard as follows:

> Two basic findings are apparent. First, that the marriage is "dead." The acts did, in fact, affect plaintiff so that it cannot reasonably be expected that she "continue to cohabit with the defendant." To quote the statute is to make the finding. The parties have not, in fact, "cohabited" for at least 14 months (according to defendant) and probably over two years. The future offers no relief. Second, defendant knew, or should have known, the effect upon plaintiff of his stiff-necked attitude, his lack of sympathy and his acts which did, in fact, affect plaintiff to the point where the marriage is now beyond rehabilitation. Yet, I find no "fault." It is, in large part, the peculiar sensibilities of plaintiff which permit the invocation of 2A:34–2(c).

> [*Id.* at 170, 379 *A.*2d 288.]

Because the standard for establishing extreme cruelty is a largely subjective one, the primary evidence required is the plaintiff's testimony that, due to the defendant's behavior, he or she in fact finds it improper or unreasonable to continue to cohabit with the defendant. Because the definition of "extreme cruelty" no longer requires a threat to the plaintiff's health, expert medical testimony is not required to prove the effect of the defendant's behavior on the plaintiff. Therefore, the Chancery Court has held

that merely alleging "extreme cruelty" in a divorce complaint does not put the plaintiff's mental condition in sufficient issue to constitute "good cause" for the purpose of justifying a court-ordered psychological examination under *Rule* 4:19. *See Devito, supra,* 136 *N.J.Super.* at 583, 347 *A.*2d 375.

Neither is it always necessary to corroborate the plaintiff's testimony regarding the defendant's behavior. The traditional rule requiring that proof of each element of an action for divorce be corroborated was eliminated by court rule in 1975. *See R.* 5:7–3; Pressler, *Current N.J. Court Rules,* comment on *R.* 5:7–3 (1997). Although corroboration may still be required at the discretion of the trial judge, *see* Pressler, *supra,* it was generally recognized, even before the new rule was enacted, that "[w]here . . . the testimony of plaintiff ma[kes] out a case of extreme cruelty, . . . 'the rule of corroboration only requires that belief in its truthfulness must find support in the testimony of others, or of surrounding established circumstances.'" *Scalingi, supra,* 65 *N.J.* at 184, 320 *A.*2d 475 (quoting *Feybusch v. Feybusch,* 110 *N.J.Eq.* 358, 359–60, 160 *A.* 386 (E. & A.1932)). Today, courts frequently do not require corroboration for extreme cruelty claims. *See Gazzillo, supra,* 153 *N.J.Super.* at 167, 379 *A.*2d 288 ("Corroboration, in any event, is no longer required, and I must draw my conclusion based upon the testimony and my evaluation of the witnesses.").

Whether pleading extreme cruelty as a ground for divorce puts the plaintiff's psychotherapy records "in issue" also depends on the functional importance to the parties of the award of divorce on that ground. In practice, claims of extreme cruelty are frequently uncontested. *See, e.g., Coney v. Coney,* 207 *N.J.Super.* 63, 69, 503 *A.*2d 912 (Ch.Div.1985) (granting divorce solely on basis of husband's unchallenged testimony as to "various acts of extreme cruelty committed by defendant against him"). The court is empowered to enter dual divorce decrees, regardless of the grounds for divorce. *See N.J.S.A.* 2A:34–7; *Chalmers v. Chalmers,* 65 *N.J.* 186, 191, 320 *A.*2d 478 (1974); *Kruger v. Kruger,* 139

*N.J.Super.* 413, 422, 354 *A.*2d 340 (App.Div.1976), *modified on other grounds,* 73 *N.J.* 464, 375 *A.*2d 659 (1977). Moreover, parties who institute actions for divorce by alleging extreme cruelty may, by consent of the other party or leave of court, amend their complaints to include the eighteen month separation ground for divorce when that cause of action accrues. *See R.* 4:9–1. Presumably influenced by convenience and the chance to minimize acrimony, parties frequently choose to do so. *See, e.g., Chalmers, supra,* 65 *N.J.* at 189, 320 *A.*2d 478; *D'Arc v. D'Arc,* 164 *N.J.Super.* 226, 231, 395 *A.*2d 1270 (Ch.Div.1978); *Indiero v. Indiero,* 116 *N.J.Super.* 193, 194, 281 *A.*2d 400 (Ch.Div.1971).

The ground of extreme cruelty remains functionally important in obtaining a divorce decree in limited circumstances. Responding to the argument that there was no need to revise the provision for divorce on the ground of extreme cruelty in light of the recommended new "separation" provision, the Commission stated:

> There will be some instances where the separation ground will be inapplicable such as the situation where a party seeks a divorce immediately after the defendant's misconduct and does not want to wait a year or more before separation ripens into a cause for divorce. A victim of extreme cruelty should not be required to wait. [*Final Report, supra,* at 71.]

In addition, because the parties do not have to live apart to obtain a divorce based on extreme cruelty, this cause of action may serve an important role where the parties are unable to afford separate lodging immediately, or where a party seeking a divorce from a recalcitrant spouse does not have the means herself to move out of the marital home or is unable to do so because of children. *Cf. Gazzillo, supra,* 153 *N.J.Super.* at 175, 379 *A.*2d 288 (dismissing defendant's assertion that law affords no relief to plaintiff in face of defendant's lack of objective bad behavior unless plaintiff leaves marital home for eighteen months).

In most cases, the practical consequences of succeeding in a divorce action on fault-based grounds, as opposed to separation, are minimal. The provision for equitable distribution of property under *N.J.S.A.* 2A:34–23 does not refer to concepts of fault, and this Court has concluded that "the concept of 'equitable

distribution' requires that fault be excluded as a consideration." *Chalmers, supra,* 65 *N.J.* at 193, 320 *A.2d* 478. Similarly, "marital fault" is not a relevant consideration in determining the extent of child support obligations under the statute. *See Ionno v. Ionno,* 148 *N.J.Super.* 259, 260–62, 372 *A.2d* 624 (App.Div.1977). Moreover, a determination of "marital fault" does not disqualify a parent from obtaining custody, except as far as such fault is independently determined to be proof of parental unfitness. *See Fantony v. Fantony,* 21 *N.J.* 525, 538, 122 *A.2d* 593 (1956); *Sheehan v. Sheehan,* 51 *N.J.Super.* 276, 291, 143 *A.2d* 874 (App. Div.), *certif. denied,* 28 *N.J.* 147, 145 *A.2d* 358 (1958); *Matflerd v. Matflerd,* 10 *N.J.Super.* 132, 138, 76 *A.2d* 722 (App.Div.1950), *certif. denied,* 6 *N.J.* 398, 78 *A.2d* 824 (1951); Annotation, *Award of Custody of Child to Parent Against Whom Divorce is Decreed,* 23 *A.L.R.*3d 6, 31–34 (1969).

According to the statute, except where the judgment is granted solely on the ground of separation, proofs made in establishing the grounds for divorce may be considered "in determining an amount of alimony or maintenance that is fit, reasonable and just." *N.J.S.A.* 2A:34–23b. However, the focus of the decision regarding alimony is generally on the financial circumstances of the parties. *See Innes v. Innes,* 117 *N.J.* 496, 503, 569 *A.2d* 770 (1990); *Mahoney v. Mahoney,* 91 *N.J.* 488, 502, 453 *A.2d* 527 (1982); *N.J.S.A.* 2A:34–23b. In *Greenberg v. Greenberg,* 126 *N.J.Super.* 96, 100, 312 *A.2d* 878 (App.Div.1973), the Appellate Division interpreted the statutory provision allowing consideration of proofs made in establishing the ground for divorce in determining alimony as referring primarily to proofs of such things as the length of the marriage, the health of the aggrieved spouse, and their style of living, and not to "marital fault." The Appellate Division stated: "Surely punishment or retribution toward an offending spouse was not a factor employable under any formula prescribing support either by legislation or general equitable principles." *Ibid.; see also Aronson v. Aronson,* 245 *N.J.Super.* 354, 364, 585 *A.2d* 956 (App.Div.1991) ("Alimony is neither a punishment for the payor nor a reward for the payee."). Our perception is that, in today's

practice, marital fault rarely enters into the calculus of an alimony award.

As stated above, "in issue" implied waiver of the psychologist-patient privilege must be tested by application of *Kozlov*'s three-part standard. Based on the elements of proof required by the cause of action for extreme cruelty, and the function of that cause of action in New Jersey divorce law, piercing the psychologist-patient privilege should be permitted only very rarely in order to enable a party to defend that cause of action. Because of the subjective and liberal standard for proving extreme cruelty, the plaintiff in the vast majority of cases is not required to allege facts that would need to be tested by reference to any information likely to be contained in a psychologist's treatment records. Moreover, where both parties seek divorce, there invariably will not be a genuine need for this type of evidence to defend the claims of the other party.

We note that although the trial court ordered plaintiff to authorize release of his records, that order was not based on the issue of the grounds for divorce but rather on the issue of custody and perhaps of marital tort. We therefore review *de novo* the evidence underlying the Appellate Division's decision to order release based on the divorce grounds. In relation to her defense of the extreme cruelty claim, defendant apparently hopes to use plaintiff's treatment records to show that plaintiff was not adversely affected, as he asserts, by any alleged acts on her part. Defendant does not seek to remain married to plaintiff and has counterclaimed for divorce. Plaintiff has not sought alimony from defendant, although she has sought alimony from him. Therefore, defendant's "marital fault," including her actions and their effect on her husband, are functionally only in issue to the extent that proof of defendant's fault might be the basis of a reduction in alimony awarded to her.

Plaintiff is not seeking to introduce any evidence related to his treatment by Dr. Milchman and he has not alleged any specific psychological damage to himself. He apparently intends to rely

for his proof of extreme cruelty on proof of the alleged acts of defendant, consisting primarily of argumentativeness, neglect and aberrational behavior, and his own testimony concerning their emotional effects on him, focusing on why defendant's conduct makes it improper or unreasonable for him to continue in the marriage. We conclude that defendant has failed to show any likelihood that information contained in Dr. Milchman's records would have unique bearing on plaintiff's case. To the extent that defendant has an interest in defending the extreme cruelty claim, and specifically the charges regarding "misconduct" on her part, other evidence, such as the testimony of lay witnesses, is available. We conclude that on this record plaintiff's factual allegations have not created a need for the evidence at issue, the evidence sought is not relevant or material to any legal issue before the court, and less intrusive sources are available to serve defendant's legitimate needs. We hold that defendant has not made a *prima facie* showing that the psychologist-patient privilege should be pierced for the purpose of defending the divorce action.

## VI

Apparently, the trial court's order requiring disclosure of the records was primarily for the purpose of determining custody and visitation arrangements. *See supra* at 292, 696 *A.*2d at 564. In contrast, the Appellate Division held that plaintiff's claim for joint legal custody and visitation with his children did not waive the psychologist-patient privilege and that the records of plaintiff's therapy with Dr. Milchman should not be disclosed for the purpose of the custody and visitation dispute. 287 *N.J.Super.* at 316, 671 *A.*2d 130. Because of the unique nature of custody determinations, the scope of the patient-psychologist privilege that may be claimed by parents in relation to custody issues poses more difficult problems than those posed by the scope of the privilege in other situations.

The range of facts that may be material and relevant to a custody determination is broad. *N.J.S.A.* 9:2–4c provides in pertinent part:

> In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow visitation not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' [sic] conduct has a substantial adverse effect on the child.

In contested cases, the court is required to make a record of its reasons for its custody decision, *see N.J.S.A.* 9:2–4f, and "must reference the pertinent statutory criteria with some specificity," *Terry v. Terry,* 270 *N.J.Super.* 105, 119, 636 *A.*2d 579 (App.Div. 1994).

 Of course, the primary and overarching consideration is the best interest of the child. *See Fantony, supra,* 21 *N.J.* at 536, 122 *A.*2d 593 ("Our law in a cause involving the custody of a child is that the paramount consideration is the safety, happiness, physical, mental and moral welfare of the child."). The best-interest analysis is an additional requirement "superimposed upon an analysis of the statutory scheme." *Terry, supra,* 270 *N.J.Super.* at 119, 636 *A.*2d 579. Moreover, that analysis requires the court to consider any and all material evidence. *In re Baby M.,* 109 *N.J.* 396, 456, 537 *A.*2d 1227 (1988) ("The custody decision must be based on all circumstances, on everything that actually has occurred, on everything that is relevant to the child's best interests." (emphasis omitted)).

 The "best-interest-of-the-child" standard is more than a statement of the primary criterion for decision or the factors to be considered; it is an expression of the court's special responsibility to safeguard the interests of the child at the center of a custody dispute because the child cannot be presumed to be protected by

the adversarial process. That responsibility was perhaps best articulated by Judge Cardozo:

[The Chancellor] acts as *parens patriae* to do what is best for the interest of the child. He is to put himself in the position of a "wise, affectionate, and careful parent" and make provision for the child accordingly.... He is not adjudicating a controversy between adversary parties, to compose their private differences. He is not determining rights "as between a parent and a child," or as between one parent and another.... Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child.

[*Finlay v. Finlay*, 240 N.Y. 429, 148 N.E. 624, 626 (1925), (quoting *Queen v. Gyngall*, 2 Q.B. 232, 241 (Esther, M.R.) (1893)).]

One consequence of the special role of the courts in custody disputes is that evidentiary rules that are accepted as part of the adversarial process are not always controlling in child custody cases. Thus, we have stated that "[t]he rules of evidence are somewhat relaxed in trials having to do with a determination of custody of an infant where it is necessary to learn of the child's psychology and preferences." *Callen v. Gill*, 7 N.J. 312, 318, 81 A.2d 495 (1951); *see also W.W. v. I.M.*, 231 N.J.Super. 495, 502, 555 A.2d 1149 (App.Div.1989) ("Generally, an exception to the hearsay rule is made for forensic reports in custody cases."); James R. Saunders III, Annotation, *Right, in Child Custody Proceedings, to Cross–Examine Investigating Officer Whose Report is Used by Court in Its Decision*, 59 A.L.R.3d 1337, 1340 (1974) ("In order to determine what is in the child's best interest, courts have often relaxed the seemingly inflexible procedural rules of traditional adversary proceeding. Thus it is said that the courts must try to give the parties litigant their fair trial in open court and at the same time try to do what is best for the child or children." (footnotes omitted)).

In implementing the "best-interest-of-the-child" standard, courts rely heavily on the expertise of psychologists and other mental health professionals. *See* David N. Bolocofsky, *Use and Abuse of Mental Health Experts in Child Custody Determinations*, 7 *Behavioral Sciences & the Law* 197, 198, 203–04 (1989); Robert J. Levy, *Custody Investigations as Evidence in Divorce Cases, 21 Fam. L.Q.* 149, 149 (1987); Annotation, *Consideration of*

*Investigation by Welfare Agency or the Like in Making or Modifying Award as Between Parents of Custody of Children,* 35 *A.L.R.*2d 629, 631–32 (1954); *see also In re Guardianship of J.C.,* 129 *N.J.* 1, 22–26, 608 *A.*2d 1312 (1992) (discussing use of psychological and psychiatric experts in termination-of-parental-rights cases). The importance of mental health experts in custody disputes was addressed by the Appellate Division in *Fehnel v. Fehnel,* which held that the trial court should have granted an adjournment in order for the court to obtain a probation department investigation and for the parties to obtain expert psychological witnesses once it became evident, shortly before trial, that a true dispute over custody existed. 186 *N.J.Super.* 209, 215–16, 452 *A.*2d 209 (1982). Judge Pressler wrote:

> There are obviously few judicial tasks which involve the application of greater sensitivity, delicacy and discretion than the adjudication of child custody disputes, which result in greater impact on the lives of those affected by the adjudication, and which require a higher degree of attention to the properly considered views of professionals in other disciplines. That is why a probation department investigation and report is mandated by *R.* 4:79–8(a). That is also why the parties must be afforded every reasonable opportunity to introduce expert witnesses whose evaluation of the family situation may assist the judge in determining what is best for the children. There have been frequent doubts expressed regarding the viability of the traditional adversarial process as an appropriate dispute resolution technique in child custody cases. But as long as we continue to resort to that process, it must be permitted to function consistently with its highest potentials.
>
> [*Id.* at 215, 452 *A.*2d 209.]

Generally, mental health experts are appointed by the court or hired by the parties to produce evaluations specifically for the purpose of the litigation. Under *Rule* 5:3–3(a), a Family Part court specifically is authorized, on its own motion, to appoint medical, psychological, or social experts to assist in the disposition of an issue before it, and to require any person under its jurisdiction to submit to examination by such an expert. Courts routinely appointed psychological experts in custody litigation even prior to adoption of that *Rule. See* Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 5:3–3 (1997). Court-appointed experts conduct independent investigations and then submit reports to the court and the parties. *See R.* 5:3–3(d), (e). Those reports may be

admitted in evidence, if subject to cross-examination. *See R.* 5:3–3(f). *Rule* 5:3–3(g) states that parents in custody disputes are not precluded from hiring their own experts, whether or not the court appoints an expert.

In many cases, information obtained from psychological evaluations prepared for the purpose of litigation is more helpful to the court than would be information obtained from the parents' prior treatment records. Such evaluations focus specifically on parental ability, whereas prior therapy may have had nothing to do with parenting. *See* Hogan, *supra,* 14 *Fam. Advoc.* at 35; Ralph Slovenko, *Child Custody and the Psychotherapist–Patient Privilege,* 19 *J. Psychiatry & L.* 163, 167 (1991). Evaluators are more likely than treating psychologists to be objective. *See id.* 167. Moreover, evaluators typically should meet both parents and the children. *See Task Force Report, supra,* at 8. In contrast, one commentator has stated that a "psychiatrist who has served as a therapist for one contesting party in the past, or who is currently a therapist for either one, is simply not in an ethical position to make a recommendation regarding the best interests of the children because of the lack of first-hand knowledge and/or clinical evaluation of the opposing spouse whom he or she has never seen." Melvin G. Goldzband, *Confidentiality in Disputes Over Custody and Visitation,* 1 *Rev. Clinical Psychiatry & L.* 133, 138 (1990); *see also* Slovenko, *supra,* 19 *J. Psychiatry & L.* at 167. Of course, evaluators do not always have as complete a picture as treating psychologists, because they meet with the family over a limited time period and because family members may succeed in camouflaging problems. *See ibid.* However, evaluators in most cases are able to detect serious issues of unfitness. *See id.* at 171. Moreover, in preparing their custody evaluations, psychologists appointed by the court or hired by the parties frequently have the benefit of consultation with any psychologists or psychiatrists who have been treating the parents or children. *See id.* at 164.

Several courts in other jurisdictions have relied on the availability of adequate information from psychological evaluations to hold

that treatment records protected by the psychotherapist-patient privilege need not be disclosed in the course of custody litigation. For example, in *Simek v. Superior Court*, 117 *Cal.App.*3d 169, 172 *Cal.Rptr.* 564 (1981), the primary custodial spouse sought the hospitalization records of the other spouse in order to contest that spouse's visitation rights. The court noted that California policy favors continued involvement of both divorced parents with their children and also favors confidentiality of communications between patient and psychotherapist. *Id.* 172 *Cal.Rptr.* at 568–69. Therefore, "[t]o exact waiver of a patient's privilege ... as a price for asserting his right to visit his own child would pose problems of a particularly serious nature." *Id.* at 569. The court suggested instead that the proper method for introducing evidence regarding the parent's emotional condition was through a court-ordered mental examination, and that "[b]y these means ... the best interests of the children could be adequately protected." *Ibid.*

Similarly, in *Roper v. Roper*, 336 *So.*2d 654 (Fla.Dist.Ct.App. 1976), *cert. denied*, 345 *So.*2d 426 (Fla.1977), in which primary custody was at issue, one spouse sought to depose the other's treating psychiatrist. The court held that, although "[t]here is *no* doubt, in a child custody dispute, that the mental and physical health of the parents is a factor that the court can and should consider in determining the best interests of the child," the spouse did not waive the psychiatrist-patient privilege simply by seeking custody. *Id.* at 656. According to the court, relevant evidence concerning the spouse's mental conditions should be obtained through a court-ordered examination. *Ibid.* The court wrote:

> We recognize that in a child custody case the mental health of a parent may be a relevant issue. Where this issue is raised the trial court must maintain a proper balance, determining on the one hand the mental health of the parents as this relates to the best interest of the child, and on the other maintaining confidentiality between a treating psychiatrist and his patient. The court in this case has an alternate tool which may accomplish both purposes. Upon proper motion the court may order a compulsory psychiatric examination.
>
> [*Id.* at 656–57.]

*See also Cabrera v. Cabrera*, 23 *Conn.App.* 330, 580 *A.*2d 1227, 1233 (upholding trial court's ruling that most appropriate source of

information about parent's mental health was examination by expert psychiatric witness, not records of treating psychologist), *certif. denied,* 216 *Conn.* 828, 582 *A.*2d 205 (1990); *Leonard v. Leonard,* 673 *So.*2d 97, 99 (Fla.Dist.Ct.App.1996) (following *Roper, supra* ); *Barker v. Barker,* 92 *Idaho* 204, 440 *P.*2d 137, 139 (1968) (holding physician-patient privilege protects psychiatric counseling records from disclosure in custody dispute and directing parties to court rule providing for court-ordered examinations); *Griggs v. Griggs,* 707 *S.W.*2d 488, 490–91 (Mo.Ct.App.1986) (holding that patient does not waive psychologist-patient privilege by seeking custody of child and that proper procedure for obtaining psychological information about parent is court-ordered examination); *Husgen v. Stussie,* 617 *S.W.*2d 414, 416–17 (Mo.Ct.App.1981) (same).

New York courts have applied a rigorous standard that allows the psychotherapist-patient privilege to be pierced only where the party seeking disclosure demonstrates that information gleaned from evaluations and other sources is inadequate. In *Perry v. Fiumano,* 61 *A.D.*2d 512, 403 *N.Y.S.2d* 382 (1978), the parties' separation agreement called for the father to be the primary custodian of the child. Subsequently, the mother petitioned for primary custody. On the mother's motion for a psychiatric examination of the father, the court ordered an examination of both parties and the child. The mother then sought records of the father's prior counseling. *Id.* 403 *N.Y.S.*2d at 384. The court applied a balancing-of-interests test. *Id.* at 385. The court held that "where it is demonstrated that invasion of protected communications between a party and a physician, psychologist or social worker is necessary and material to a determination of custody the rule of privilege protecting such communications must yield" to the court's duty to protect the welfare of the child. *Id.* at 386. Nevertheless, the *Perry* court emphasized that, in light of the potential "chilling effects," psychotherapist-patient privileges should not "cavalierly be ignored or lightly cast aside." *Ibid.* Instead, "[t]here first must be a showing beyond 'mere conclusory statements' that resolution of the custody issue requires revelation

of the protected material." *Ibid.* The court suggested that, if the court-appointed psychiatrist asserted a need for the records in aid of his evaluation, the records might be made available to the psychologist. *Id.* at 387.

In *Hickox v. Hickox,* 64 *A.D.2d* 412, 410 *N.Y.S.2d* 81 (1978), another New York appellate court followed and refined *Perry.* The court ordered the trial court to consider if and to what extent there should be disclosure of treatment records:

> In making such direction, the justice shall consider any psychiatric testimony offered or proposed; whether there has been a waiver of privilege; and whether the records are material and necessary for the purpose of determining custody, or whether the court and the parties have sufficient information to determine future custody without such disclosure, or perhaps even preliminary examination by the justice himself. Before permitting disclosure of these records or any part of them to the parties, the Special Term justice shall himself examine the records and determine which if any parts of the records shall be disclosed.
>
> [*Id.* 410 *N.Y.S.*2d at 84.]

Courts that have ordered disclosure of treatment records, in addition to relying on independent psychological evaluations, typically have been confronted with evidence of recent or continuing serious mental illness bearing on potential unfitness. For example, *In re Marriage of Nordby,* 41 *Wash.App.* 531, 705 *P.2d* 277 (1985), concerned a parent who had been hospitalized, diagnosed by an evaluating psychiatrist as suffering from serious mental illness, and observed by the court to be "disjointed, rambling, and in many cases unresponsive." *Id.* 705 *P.2d* at 278–80. The court held that, while disclosure of treatment records should not be "pro forma" in child custody cases, "in cases such as this where the circumstances clearly indicate neglect, the discovery and admissibility of prior psychological evaluations may be warranted." *Ibid.;* see also *Owen v. Owen,* 563 *N.E.*2d 605, 608 (Ind.1990) (holding that parent waived privilege by contesting custody in case involving recent hospitalization of parent for mental illness); *Werner v. Kliewer,* 238 *Kan.* 289, 710 *P.2d* 1250, 1255 (1985) (same); *Clark v. Clark,* 220 *Neb.* 771, 371 *N.W.2d* 749, 752–53 (1985) (same). Similarly, in the frequently cited case of *Critchlow v. Critchlow,* the mother was committed to a hospital for mental treatment

while the divorce was pending. Although the issue of custody had not previously been contested, the father subsequently amended his counterpetition to seek custody. 347 *So.*2d 453, 454 (Fla.Dist. Ct.App.1977). The parties agreed to the appointment of a psychiatrist to examine both parents and the child and render a recommendation. The psychiatrist recommended that the mother retain custody. *Ibid.* The court then authorized depositions of the mother's treating psychiatrists on two grounds: (1) that she explicitly waived the privilege before belatedly asserting it and (2) that her "mental health [was] a highly relevant issue." *Id.* at 454–55. Florida courts subsequently have held that a parent does not waive the psychologist-patient privilege simply by seeking custody or denying allegations of unfitness in a custody case and stated that the *Critchlow* holding is limited to its facts. *See Freshwater v. Freshwater,* 659 *So.*2d 1206, 1207 (Fla.Dist.Ct.App.1995); *Mohammad v. Mohammad,* 358 *So.*2d 610, 612–13 (Fla.Dist.Ct.App. 1978).

In general, review of the law of other jurisdictions reveals that most courts do not pierce the psychotherapist-patient privilege automatically in disputes over the best interests of the child, but may require disclosure only after careful balancing of the policies in favor of the privilege with the need for disclosure in the specific case before the court. *See, e.g., Cabrera, supra,* 580 *A.*2d at 1233 (holding, in custody case, that party seeking admission of testimony subject to psychologist-patient privilege had not met statutory burden to persuade court that justice required admission), *certif. denied,* 216 *Conn.* 828, 582 *A.*2d 205 (1990); *Mass. Gen. Laws* ch. 233, § 20B(e) (allowing disclosure "[i]n any case involving child custody, ... in which, upon a hearing in chambers, the judge, in the exercise of his discretion, determines that the psychotherapist has evidence bearing significantly on the patient's ability to provide suitable care or custody, and that it is more important to the welfare of the child that the communication be disclosed than that the relationship between patient and psychotherapist be protected...."). The balancing test often takes the form of a strict *in camera* review by the court for relevancy. *See, e.g., Owen, supra,*

563 *N.E.*2d at 608 (holding that party waived physician-patient privilege covering psychiatric treatment records by petitioning for custody, but that, on motion of party asserting privilege, court should review documents *in camera* for relevancy before disclosing them); *Morey v. Peppin,* 353 *N.W.*2d 179, 183 (Minn.Ct.App. 1984), (requiring trial court to review therapy records *in camera* before disclosing them in order "to prevent disclosures that are irrelevant to the custody question or otherwise annoying, embarrassing, oppressive, or unduly burdensome"), *rev'd on other grounds,* 375 *N.W.*2d 19 (Minn.1985); *Clark, supra,* 371 *N.W.*2d at 752–53 (holding that court must review documents *in camera* for relevancy because seeking custody "does not result in making relevant the information contained in the file cabinets of every psychiatrist who has ever treated the litigant"). *But see, e.g., Atwood v. Atwood,* 550 *S.W.*2d 465 (Ky.1976) (holding that seeking custody automatically waives psychiatrist-patient privilege); *Kirkley v. Kirkley,* 575 *So.*2d 509, 510–11 (La.Ct.App.) (holding that physician-patient privilege is waived by contesting custody, but noting that trial court has power to seal records or take testimony in chambers), *writ denied,* 577 *So.*2d 19 (La.1991).

We note that a problem of scope of waiver arises when a party executes specific purpose releases or otherwise partially waives the psychologist-patient privilege in order to allow a psychologist who has been appointed or hired for the purpose of litigation to review records or consult with a treating psychologist. A Connecticut appellate court considered that issue in *Cabrera, supra,* in which the question was whether a mother in a custody dispute waived the psychologist-patient privilege concerning the testimony of a former treating psychologist when she introduced a report and the testimony of an independent expert psychiatrist to rebut the findings of the court-ordered "family relations" evaluation. 580 *A.*2d at 1233. Both the "family relations" evaluator and the evaluating psychiatrist hired by the plaintiff consulted with her former treating psychologist in preparing their reports. *Id.* at 1230–31. The court held that, although the party invoking privilege had put the communications "in issue," the party seeking

disclosure failed to establish sufficient grounds for requiring the admission of the testimony. It therefore upheld the trial court's decision not to allow the introduction of the treating psychologist's testimony based on its determination that the evaluation for the purpose of litigation was the better source of information. *Id.* at 1233.

In 1991, the American Psychiatric Association published the recommendations of a task force established to study court-ordered disclosure of confidential communications between patients and treating psychiatrists for use in custody disputes. *See Task Force Report, supra.* The task force summarized the problem faced by courts in deciding what information should be privileged:

> Clearly the state has a compelling interest in avoiding placement of a child in the custody of a parent who is psychologically unfit to provide adequate care, or who, because of psychiatric disorder, presents a risk of harm to the child. Information that might prevent such a detrimental placement is highly relevant. Thus it is not surprising that courts often are eager to learn whatever a treating psychiatrist may know or have recorded about a parent's mental health. However, a routine practice of compelling disclosure often could result in costs, to both parents and children, that far outweigh the beneficial value of this information.
>
> Treatment records frequently contain information about the parents, the child, and other family members that may distress or stigmatize the parent/patient and the child both at the time of disclosure and in the future. A parent may respond to the prospect of coerced disclosure of treatment information by deciding not to contest custody, or by making substantial concessions about support and property to avoid adjudication. In effect, the threat of court-ordered disclosure can too easily become a strategic weapon for the other parent.
>
> Compelled disclosure of treatment information will impair the potential benefits of treatment. Indeed, parents who anticipate the possibility of divorce in their future could well be deterred from seeking psychiatric care, a decision that will be detrimental to both the parent and the child. Unhappy spouses often enter psychotherapy in response to marital stress; if successful, such treatment can benefit all family members. However, individuals will be less inclined to enter treatment if disclosures to a psychiatrist could later be used in a custody dispute. In general, a cost to society is incurred if persons who experience impairment in functioning or in relationships due to psychological difficulties are reluctant to seek treatment out of fear that private disclosures may later be made public. The costs may be increased when psychiatrists anticipating the possibility of coerced disclosure feel ethically obligated to warn patients at the commencement of treatment that the promise of confidentiality is qualified. Such a practice potentially could

undermine the therapeutic relationship, whether or not the patient ever actually faces a custody battle.

[*Task Force Report, supra,* at 4.]

The Task Force recommended drawing "a sharp distinction ... between the typical divorce custody proceeding and the relatively uncommon divorce case in which a parent's capacity to care adequately for the child because of 'emotional instability' is at issue." *Id.* at 5. The Task Force favored disclosure of psychiatric treatment records only in cases where there was a threshold showing of parental unfitness and where the treatment records were likely to contain relevant evidence that could not be obtained elsewhere. *Id.* at 6. Specifically, the Task Force recommended that courts should make the following findings before ordering disclosure: (1) the treatment was recent enough to be relevant; (2) substantive independent evidence of serious impairment exists; (3) sufficient evidence is unavailable elsewhere; (4) court-ordered evaluations are an inadequate substitute for disclosure; (5) given the severity of the alleged disorder, communications made in the course of treatment are likely to be relevant. *Id.* at 6–10. The Task Force suggested that, as a rule, inpatient treatment records are likely to be more relevant than outpatient records. *Id.* at 7.

The task force's recommendations reflect sound analysis that is consistent with the most thoughtful approaches taken by legislatures and courts. The Family Part, when presiding over custody disputes, must consider the mental health of the parents as well as the psychological well-being of the family as a whole. In doing so, courts should avail themselves of the expertise of mental health professionals. However, by contesting custody or visitation, a parent does not automatically put information contained in records of *therapy* with such professionals "in issue." In regard to therapy records, which are at the heart of the psychologist-patient privilege, the courts must strike a balance between the need to protect children who are in danger of abuse or neglect from unfit custodians and the compelling policy of facilitating the treatment of parents' psychological or emotional problems. Such a balance is in the best interest of the child.

■■■ Therefore, the first source of information about the parents' mental health should be the independent experts appointed by the courts or hired by the parties for the purpose of litigation, rather than the professionals who have established relationships with the parties. In most cases, the assistance provided by independent experts should be sufficient. Only when the court perceives, after consideration of all of the evidence, that the information gained from independent evaluations is inadequate, should the court consider piercing the psychologist-patient privilege to compel disclosure of prior treatment records to the court and the parties. The decision to order such disclosure must be based on independent evidence of potential for harm to the child, for example, the fact of a recent hospitalization, the opinion of an expert, or the court's own observations. The court must also consider whether, based on the context of the prior treatment, the records are likely to contain relevant evidence, and whether such evidence is likely to be merely cumulative. Before releasing records to the parties, the court should conduct an *in camera* review, releasing only material that is relevant and material to the issues before it.

■■■ In presiding over the custody and visitation litigation underlying this appeal, the court below was confronted with serious allegations of domestic violence as well as substance abuse. One complicating factor was that, some eighteen months after the court-appointed psychologist completed her initial report, defendant's counter-complaint was amended to include many more specific allegations, including allegations of continuing abuse of the children during visitation. Allegations alone, however, cannot be adequate to justify piercing the psychologist-patient privilege.

The evidence before the court included a 1993 report by a court-appointed psychologist who met on several occasions with the family members and consulted with plaintiff's treating psychologist. The court also had the benefit of a 1994 report prepared by a court-appointed mediator, who consulted with the treating psychologists of both parents and the children. We note that, appropriately, neither report directly disclosed the substance of any

privileged communications with treating psychologists. We presume, however, that whatever the psychologists told the appointed experts was reflected in the experts' conclusions. We also note that, although the allegations in the amended complaint were significantly more serious, the reports reflect that the basic elements of defendant's allegations of domestic violence and substance abuse were considered by the experts, as well as plaintiff's admissions of the essential allegations. The reports largely concurred that plaintiff should be granted reasonable visitation. Neither report stated that either parent was unfit or a danger to the children or otherwise suggested that information contained in treatment records might be important to the court's determination. We are also unaware of other evidence that would compel that conclusion.

Not having the benefit of our opinion, the trial court in its ruling simply stated that the history or lack of history of abuse was relevant to the custody determination. Like the Appellate Division, we are not satisfied on this record that the trial court properly balanced the need for the records with the important public policy underlying the psychologist-patient privilege. Because the decision to permit disclosure of treatment records is one best made by the trial court, which is most familiar with all of the factors in the case, and in light of the often evolving nature of a custody or visitation dispute, we remand to the trial court for reconsideration of whether the psychologist-patient privilege should be pierced to compel release of plaintiff's therapy records for the purpose of the custody determination. On remand, the court is instructed to make findings in accordance with the principles outlined in this opinion and consider whether all other sources of information available to the court are adequate to justify adjudication of the custody and visitation issues without resort to the plaintiff's therapy records.

## VII

Courts should be mindful that, although New Jersey's psychologist-patient privilege is modeled on the attorney-client privilege,

the public policy behind the psychologist-patient privilege is in some respects even more compelling. Like the attorney-client privilege, the psychologist-patient privilege serves the functional purpose of enabling a relationship that ultimately redounds to the good of all parties and the public. The psychologist-patient privilege further serves to protect an individual's privacy interest in communications that will frequently be even more personal, potentially embarrassing, and more often readily misconstrued than those between attorney and client. Made public and taken out of context, the disclosure of notes from therapy sessions could have devastating personal consequences for the patient and his or her family, and the threat of such disclosure could be wielded to unfairly influence settlement negotiations or the course of litigation. Especially in the context of matrimonial litigation, the value of the therapist-patient relationship and of the patient's privacy is intertwined with one of the most important concerns of the courts—the safety and well-being of children and families. Therefore, only in the most compelling circumstances should the courts permit the privilege to be pierced.

## VIII

We affirm the Appellate Division's disposition of the privilege issue with respect to the marital tort claim and reverse its disposition with respect to the extreme cruelty claim. The matter is remanded to the Family Part for further proceedings and, consistent with this opinion, to reconsider the privilege issue in the context of the custody and visitation issues.

*For affirmance in part; reversal in part and remandment—* Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed—*None.