153 N.J. Super. 159 (1977)
379 A.2d 288
ELLEN GAZZILLO, PLAINTIFF,
v.
DENNIS GAZZILLO, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 3, 1977.
*164 Mr. Donald R. Conway for plaintiff.
Mr. Herbert Klitzner for defendant (Messrs. Lewis and DeClemente, attorneys).
LESTER, J.S.C.
This is an action for divorce based upon "extreme cruelty" as defined in N.J.S.A. 2A:34-2(c). The unusual facts of this case test the flexibility of the new Divorce Act, specifically the extent to which the second paragraph of the statute invokes "fault" or "no fault." The issue presented to this court is whether certain acts of defendant husband constitute "extreme cruelty" as defined in the statute, so as to justify plaintiff's petition for divorce.
N.J.S.A. 2A:34-2(c) provides as a ground for divorce:
Extreme cruelty, which is defined as including any physical or mental cruelty which endangers the safety or health of the plaintiff or makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant; * * *.
The parties were married on August 30, 1969 in Bethesda, Maryland, home of plaintiff. Both plaintiff and defendant are bona fide residents of the State of New Jersey. A child of the marriage was born about 2 1/2 years ago. Residential and jurisdictional requirements are met.
The facts are hotly contested. Plaintiff has alleged and testified that beginning in the latter part of 1970 and continuing through the present, defendant has been guilty of "extreme cruelty" toward her. The acts generally complained of by plaintiff, corroborated in part by her witnesses and denied categorically by defendant, include (among other things) a hostile, critical and uncommunicative attitude toward plaintiff, a gross misunderstanding of plaintiff's desire to see a marriage counselor, constant belittlement, abusive language and threats of violence directed at plaintiff. *165 Plaintiff has also alleged continuous, albeit inconsistent, fits of unprovoked anger and harassment by defendant resulting in humiliation and embarrassment.
In addition to general allegations, there was testimony with respect to all eleven subparagraphs of paragraph Four of the complaint alleging specific examples of "extreme cruelty." Paragraph Four reads in pertinent part:
(a) In the Fall of 1970, during one of his rages, the defendant kicked a hole in the closet door of their apartment.
(b) During the Fall of 1970, the defendant continuously harassed the plaintiff about her seeing a psychiatrist, even though she had often tried to explain to him her reasons for seeking therapy. The defendant called the plaintiff a "sickie" and a "freak" until, finally, he intimidated her into stopping therapy before she was ready to do so. * * * When she told him she wished to continue for a while, he screamed and yelled and said he would not hear of it. * * *
(c) In or about the Spring of 1971 * * * the plaintiff, and her sister, were involved in a near accident, * * * The plaintiff was quite shaken by the experience. When she told the defendant about it that night, he screamed and yelled at her and then went to bed, refusing to talk further either to the plaintiff or to her sister. * * *
(d) In or about January of 1972, while driving to their recently purchased home, the defendant went into a rage because the plaintiff was not sure of the directions. He grabbed her with his free hand, shook her and threatened her.
(e) In or about February of 1972, the defendant, in one of his violent rages, threatened the plaintiff and chased her down the stairs. Terrified, the plaintiff ran out the front door. The defendant then, despite the freezing weather, locked the plaintiff out of the house. * * * While she was outside, the defendant pulled down all the shades and acted very strangely.
(f) In the Spring of 1972, the defendant refused to permit the plaintiff to have her sister and her family, who resided in Maryland but were then visiting in Long Island, to dinner. The plaintiff invited them to lunch when the defendant was not at home. It was embarrassing for the plaintiff to have to make excuses for the defendant.
(g) In or about December of 1973, the plaintiff was nine months pregnant and her water broke, but her labor did not start. The defendant spent the whole day alternately blaming the plaintiff and then not speaking to her because her labor had not started (he had earlier blamed her for not getting pregnant soon enough and having some trouble in the early months).
(h) During the Spring and Summer of 1974, the defendant consistently refused to make it possible for the plaintiff to get out at night by refusing to watch the baby. One night, * * * the plaintiff *166 insisted that the defendant watch the baby while the plaintiff and her mother went to the movies * * *. Plaintiff was gone for two hours. When she returned, the baby was screaming alone in her crib. * * * [T]he baby * * * was still dressed, not in her pajamas (at 10:00 P.M.) and was soaked with sweat. * * * The plaintiff was upset and embarrassed.
(i) In or around the Spring of 1974, the defendant planned a five day trip to Maryland on business. The plaintiff planned to go along and stay at her mother's home, * * *. One night at dinner, the defendant indicated they could go only for four days. When the plaintiff expressed mild disappointment, the defendant flew into a rage, jumped up from the table, then put his arms around her throat as if to choke her. The defendant screamed that he hated and wanted to kill the plaintiff. * * * All of this transpired in the presence of the baby, who was upset by it.
(j) In or around the Summer of 1974, * * * friends invited the plaintiff and defendant to dinner. The defendant reluctantly agreed to go * * * but later had second thoughts and said no. The plaintiff, who had already spoken with her friends, insisted on attending. The defendant carried on all afternoon screaming and yelling. On the way to New York, the defendant drove about 30 mph on Route 17 (dangerously slowly) and hurled verbal abuses at the plaintiff, calling the plaintiff and her friends * * * obscene names * * *. When they arrived, the defendant continued the fight in front of the plaintiff's friends, embarrassing and insulting her.
(k) In or around the Winter of 1975, one night at dinner, the plaintiff and defendant had an argument and the defendant threw a piece of meatloaf at the plaintiff. * * *
With respect to subparagraph (a), defendant denies any incident and says there was never any hole. Plaintiff's sister cannot corroborate the occurrence but does testify that the hole was there, it having been pointed out to her by plaintiff.
As to subparagraphs (b), (d), (e), (f), (g), (i), (j) and (k), plaintiff testified as to the incidents and defendant not only denies the occurrences but says that the same are completely fabricated.
Subparagraph (c) and (h) were partly corroborated, the former by plaintiff's sister and the latter by her mother.
Defendant states that any corroboration by any member of plaintiff's family was fabricated.
Some comments regarding plaintiff's allegations are required. As to the "hole in the door" incident (subparagraph (a)), this so-called act of cruelty is not so horrendous *167 as to bring shame upon the husband, even if true. I believe, and do find, that there was a hole in the door. I observed the witnesses. I took into account their loyalties. Plaintiff says the hole was "kicked" in the door. Defendant says it never happened; that there never was a hole in the door (kicked or otherwise); that all was fabricated. I find that the incident did occur.
With respect to the other acts, the corroboration was minimal. Plaintiff's sister did corroborate the "near accident" incident (subparagraph (c)) and plaintiff's mother heard the baby crying, observed that she had been crying for a long time; and that plaintiff was upset (subparagraph (h)).
The other corroboration was of the "hearsay type" wherein plaintiff told her sister or mother of the acts some time after they arose. Ordinarily, the court would give little, if any, weight to such testimony but here not only were the observations and recollections of the witnesses often adduced (in the absence of direct testimony) on cross-examination but also the witnesses did observe the changes in the attitudes and mental health of plaintiff during the period in question. "She was terribly upset"; "They were drifting apart"; "He showed no affection," and so forth. There is no question but that there was "some truth" to the allegations of fact by plaintiff and there is equally no question but that there was an effect upon plaintiff.
There were acts of "temper"; there was name calling; there was lack of understanding; there was a type of harassment. I do find an uncommunicative attitude toward plaintiff. Defendant objected to plaintiff seeing Mr. Miller even though he knew of her prior psychological problems and knew, or should have known, that prior visits to the psychologist were of aid to plaintiff.
Corroboration, in any event, is no longer required, and I must draw my conclusion based upon the testimony and my evaluation of the witnesses. The failure on the part of either party to call any witness who may have corroborated any given factual allegation is of little weight.
*168 Yet, I can find no proven specific act which would, under the law prior to the statutory revision, amount to "extreme cruelty." I do find in defendant a lack of understanding of the effect of his own acts. I find an arrogance that precludes the compromises that are essential elements of a good marriage. I find in defendant a complete lack of contact with reality. Here is a couple that has not slept together in two years.[1] Here is a wife adamant in her position that the marriage is dead, who, now for at least the second time, institutes divorce proceedings. Here is a woman who has, both before and after marriage, sought and received psychological help and now feels free of that need. Finally, here is a defendant who states in response to an inquiry if this is a dead marriage, that (1) all will be well if plaintiff seeks further psychological help (provided it is not Mr. Miller) and even if plaintiff does not seek such help, that (2) his love of plaintiff and his love of marriage will ultimately provide the way to an awakening of this dead marriage.
Defendant states without hesitation that he has done nothing to imperil the marriage; that he has, since the inception of the marriage, done all of the shopping, all of the cooking, and at least half of the cleaning. Counsel for plaintiff, in summation, argued (and not without some logic) that defendant was "so perfect" that no one could live with him. This "logical" conclusion is neither logical nor conclusionary unless one approaches the statutory standard in a manner which permits an examination of defendant's acts and attitudes as they subjectively affected plaintiff. Surely, the court finds no malice, no improper intent, and no cruelty in the lay sense. Defendant's acts and attitudes, so objectionable to plaintiff, may well be the type of acts and *169 attitudes that would hold together a different marriage with a different partner.
The court thus faces several determinations of fact and law. What, in fact, are the acts of defendant upon which plaintiff relies in seeking relief? What effect did these acts have upon plaintiff? Assuming that the effect upon plaintiff, in fact, met the statutory standard, should this court deny relief if it is determined that the acts complained of were per se minimal and that they would not have affected the "reasonable" plaintiff as, in fact, they did affect this particular plaintiff?
Defendant denies categorically the allegations of every act of "extreme cruelty." He denies even the existence of circumstances upon which these allegations are based. He bluntly accuses his wife, his mother-in-law and his sisters-in-law of lying on the stand. I have great difficulty in accepting, and do not accept, this conclusion. We do not have conflicting versions of various incidents. We have allegations and outright denials.
Defendant points out numerous greeting cards (anniversary, birthday, and so forth) sent by plaintiff over the years, expressing affection for defendant. I find nothing inconsistent in plaintiff's sending such cards. She did have affection for defendant. She claims, nevertheless, that his acts make it "unreasonable or improper" for her to continue the marital relationship.
In light of the evidence the court must decide this matter under the standard of the statute. Defendant is blinded, to some extent, by his own self-righteous attitude. I do not find a familial conspiracy to shed defendant as a husband. I do find acts demonstrating a lack of compassion and understanding and indicating a lack of sympathy toward plaintiff and her ambitions. Plaintiff may be exaggerating, and the court has great difficulty in determining exactly what occurred when a flat denial of any incident is made by defendant. I cannot, for example, in the light of the one-on-one conflicting stories, find that plaintiff has met her burden as *170 to the "choking" incident (subparagraph (i)). The court must and will, however, assume these acts alleged were "more or less" committed by defendant. Not one of these acts, standing alone, nor all of them in the aggregate, would, as noted before, suffice as grounds for divorce under N.J.S.A. 2A:34-2(c) as affecting the "safety or health of the plaintiff." The question thus remains if these same acts make "it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant". The court must determine whether the latter quoted language is "no fault" language and whether one should approach the statute from a subjective or an objective point of view.
Two basic findings are apparent. First, that the marriage is "dead." The acts did, in fact, affect plaintiff so that it cannot reasonably be expected that she "continue to cohabit with the defendant." To quote the statute is to make the finding. The parties have not, in fact, "cohabited" for at least 14 months (according to defendant) and probably over two years. The future offers no relief. Second, defendant knew, or should have known, the effect upon plaintiff of his stiff-necked attitude, his lack of sympathy and his acts which did, in fact, affect plaintiff to the point where the marriage is now beyond rehabilitation. Yet, I find no "fault." It is, in large part, the peculiar sensibilities of plaintiff which permit the invocation of N.J.S.A. 2A:34-2(c).
Given the signs of discontent and given the separate bedrooms for two years, can a husband continue to do those "normal" acts which brought about these conditions? If a husband continues to do those "normal" acts which he knows, or should know, are contributing to a breakup of the marriage and which affect his wife to that end  especially since he neither admits any fault nor offers to change  is he, in fact, committing acts of "extreme cruelty" which make it "unreasonable to expect the plaintiff to continue to cohabit with the defendant"?
*171 Defendant contends that extreme cruelty remains as a fault ground and, as such, requires the elements of serious misconduct and causation. While it is true that the State of New Jersey Divorce Law Study Commission said that it
* * * does not recommend, at this time, the complete elimination of fault as a consideration in marriage termination. * * * [Final Report to the Governor and the Legislature of the Divorce Law Study Commission, May 11, 1970, at 6-7]
the commission report goes on to say that it is
* * * The central policy advocated by the Commission * * * that it be legally possible to terminate dead marriages, * * *. [Id. at 7]
Not only is it the central policy of the Commission to terminate dead marriages, but it also reflects the public policy of the New Jersey judiciary. See Wanser v. Wanser, 119 N.J. Super. 190 (Ch. Div. 1972); Ballard v. Ballard, 124 N.J. Super. 462 (Ch. Div. 1973).
Prior to the 1971 amendment to N.J.S.A. 2A:34-2(c) a cause of action for divorce on the ground of extreme cruelty required a showing that such cruelty
* * * endangered the life or health of the aggrieved party, or rendered his or her life one of such extreme discomfort and wretchedness as to incapacitate him or her physically or mentally from discharging the marital duties. 11 New Jersey Practice (3d ed. Herr-Lodge), § 1265, pp. 496-497 (1963). [Scalingi v. Scalingi, 65 N.J. 180, 183 (1974)]
The 1971 amendment expanded the definition of extreme cruelty to include:
* * * any physical or mental cruelty which endangers the safety or health of the plaintiff or makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant; * * *. [N.J.S.A. 2A:34-2(c)]
The case of DeVito v. DeVito, 136 N.J. Super. 580 (Ch. Div. 1975), while not binding upon this court, is instructive *172 in measuring the effect of the 1971 amendment. There, plaintiff wife filed a complaint for divorce based upon the grounds of sexual desertion and extreme cruelty. Defendant husband requested an order compelling plaintiff to undergo a physical and/or mental examination. The court denied defendant's motion stating that (1) a physical examination could not reveal the presence or absence of any sexual activity and (2) plaintiff had alleged no physical cruelty. The 1971 amendment, the court went on to note, precluded the need for plaintiff to show injury to her health or safety; plaintiff only had to demonstrate that the acts of defendant made it improper or unreasonable to expect her to continue to cohabit with him.
Thus, the court finds that the revised statutory language has broadened the concept of extreme cruelty and indicates that the test as to whether there is sufficient evidence to support the `cruelty' allegation is a subjective one. Scalingi, supra; Kerr v. Kerr, 129 N.J. Super. 291 (App. Div. 1974); Note, "The 1971 New Jersey Divorce Law," 25 Rutgers L. Rev. 476, 487-490 (1971). * * * DeVito at 583; emphasis supplied
The flexibility and liberality of the new Divorce Act, as evidenced by cases such as DeVito v. DeVito, supra, should be extended to the case presented to us. Contrary to defendant's position, the means toward the end of terminating dead marriages must include "no-fault" grounds as well as "fault" grounds. According to the Divorce Law Study Commission Report:
* * * It is not * * * in the public interest to require dead marriages to continue for the sake of statistical neatness or comparison or on a misguided assumption that thereby family life is strengthened. * * * [Final Report, op. cit., at 11-12]
Unfortunately, the romantic belief that love will conquer all has little place in today's society under our existing statute, unless it is accompanied by a good-faith, constructive effort to reform one's actions which have contributed to the deterioration of the marriage. Defendant has not and, apparently, *173 is not prepared to change his attitude toward marriage generally and toward his wife's wishes specifically. He says, "I need not change. I have done nothing wrong."
Having found that defendant's acts, standing alone, would neither suffice to constitute objective "physical or mental cruelty which affects the safety or health of the plaintiff" nor suffice to constitute cruelty which objectively "makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant," this court, nevertheless, determines that the plaintiff is entitled to a divorce. The acts of defendant do constitute extreme cruelty where defendant knew, or should have known, that his acts and his refusal to alter his attitude toward his wife would ultimately destroy the marriage. One must look to the peculiar sensibilities of plaintiff wife in order to lend meaning and relevancy to the divorce statute.
According to a law review article on the 1971 Divorce Act, the Commission Report
* * * does not indicate clearly whether it intended that the word unreasonable be interpreted with reference to the subjective feelings of individual plaintiffs or to more objective community standards. * * * [25 Rutgers L. Rev. 476, 488 (1971)]
The Report itself states that:
* * * [The] Courts will be able to read into it [this clause] community standards of marital misconduct. Such an opening may invite abuse. Yet, on the other hand, the phraseology is also readily adaptable to changing views as to marital misconduct and should prevent the stultification that was experienced under the old judicial definition of "extreme cruelty". * * * [at 70; emphasis supplied]
At page 69 of the Report, the Commission states that the "focus should be upon what the misconduct has done to the marriage and plaintiff. * * *" (Emphasis supplied.)
This Court finds that the second part of N.J.S.A. 2A:34-2(c) should be interpreted subjectively, taking into account plaintiff's particular and peculiar sensibilities.
*174 * * * Focusing on the plaintiff's feelings is the best way to determine whether the defendants' conduct makes further cohabitation unreasonable. If attention is directed to community standards of unreasonableness, injustice might be done. What humiliates one person may have no effect on another. * * *" [25 Rutgers L. Rev. at 489; emphasis supplied]
Such an interpretation gives meaning to N.J.S.A. 2A:34-2(c) and lends great practicality to our divorce statutes.
There is no reason to believe that such an interpretation would contravene the philosophy of no-fault divorce or the public policy of this State. In an intolerable marital situation, such as the case at bar, wherein defendant husband is insensitive and unresponsive to plaintiff wife's needs, to require objective fault would be fruitless. Whether "community standards of marital misconduct" (Skoloff, New Jersey Family Law Practice (3 ed.), at 450) are satisfied on the facts presented is not the subject of this court's inquiry. Whether a reasonable person would find that defendant's acts constitute "extreme cruelty" and, thus, warrant a divorce is likewise irrelevant. The focus of this court's scrutiny is whether defendant's acts, in light of plaintiff's emotional and psychological sensibilities, make it "* * * `unreasonable to expect these parties to live in any type of harmony that a viable marriage will require.' * * *" Kerr v. Kerr, 129 N.J. Super. 291, 293 (App. Div. 1974). Defendant's argument that plaintiff must prove fault, despite the erosion of the marital bonds, is both inconsistent with the philosophy of our divorce laws and is impractical in view of this irretrievably dead marriage.
The facts of this case convince the court that any further delay in granting plaintiff a divorce would render her an injustice.
If the familial relationship has so far deteriorated that plaintiff seeks a divorce, there is no social good to be achieved by withholding the remedy. Reconciliation cannot be achieved unilaterally. [Altbrandt v. Altbrandt, 129 N.J. Super. 235, 238 (Ch. Div. 1974); emphasis supplied]
*175 A unilateral reconciliation attempt will be to no avail. This marriage is dead.
Defendant's memorandum of law, while well-reasoned and persuasive, is like defendant's suggestion of maintaining the status quo  unjust and illogical in the face of the existing attitude and condition of plaintiff and my determination that this marriage is incapable of being revived. For over two years this plaintiff and this defendant have not cohabited. They have not shared the same bedroom for well over a year. Under the circumstances of the facts presented it is obvious that defendant could sustain an action for divorce on the grounds of (sexual) desertion. Defendant, however, does not seek a divorce. He vigorously opposes the plaintiff's attempt to that end. He testifies that he "loves marriage." He argues that, ultimately, his love will bring to life this marriage termed "dead" by his wife and found to be dead by this court. He professes concern for his wife and the marriage. Yet, his actions and his attitudes bring this court to the conclusion that he has neither the desire nor the ability to revive the corpse. Inferences or suggestions that if plaintiff gives up her friends (divorced or separated and, thus, of the type that would undermine the marriage basis), gives up her connection with the "women's lib" movement, goes to a psychologist or psychiatrist other than Mr. Miller, that defendant's love will conquer all; that time will heal all; or that the law affords no relief to plaintiff "ever" unless plaintiff leaves the marital home for 18 months, are moralistic generalities that fly in the face of logic and the public policy as espoused by the 1971 revisions to this State's divorce laws.
A course must be charted. Some rational meaning must be afforded to the two principles of law here involved: (1) that it is the policy of this State to terminate dead marriages, and (2) that the revision allows one to obtain a divorce if the acts (of extreme cruelty) are such as to make it "unreasonable or improper to expect plaintiff to continue to cohabit with the defendant."
*176 The second portion of N.J.S.A. 2A:34-2(c), insofar as it requires one to examine the subjective effect of defendant's acts upon plaintiff, constitutes a "no-fault" divorce concept with the sole proviso that it must be determined (as it was here determined) that defendant knew, or should have known, of the effect of his acts upon plaintiff.
One must balance the equities in light of the statutory language, the existing facts and the public policy of the State to terminate dead marriages.
A judgment of divorce will be entered in favor of plaintiff and against defendant.
NOTES
[1] That a "major" issue of fact was raised by defendant who indignantly charges his wife with lying when she says they had not had intercourse in over two years (he stating that it has been only fourteen months) is indicative of the problem presented to the Court.