**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2440-20

SYLVIA STEINER,

     Plaintiff-Respondent,

v.

DAVID S. STEINER,

     Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**January 12, 2022**

**APPELLATE DIVISION**

Argued December 7, 2021 – Decided December 15, 2021

Before Judges Fisher, Currier and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-2818-18.

Eric S. Solotoff argued the cause for appellant (Fox Rothschild LLP, attorneys; Eric S. Solotoff, of counsel and on the briefs; Eliana T. Baer, on the briefs).

Jane J. Felton argued the cause for respondent (Skoloff & Wolfe, PC, attorneys; Jonathan W. Wolfe and Jane J. Felton, of counsel and on the brief; Michaela L. Cohen, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Plaintiff Sylvia Steiner commenced this action for a dissolution of her lengthy marriage to defendant David S. Steiner based on irreconcilable differences. Because David contested the grounds for divorce, the presiding judge bifurcated that question from the remainder of the case. After a trial that concerned solely whether there were grounds for divorce, the judge found in Sylvia's favor and entered a judgment of divorce, which was later certified by the trial judge as a final order.

In this appeal, which we permitted notwithstanding the likelihood the certification of the judgment as final was improvident – because, if it was, we would have granted leave to appeal – David argues that the issues should not have been bifurcated, the judgment was against the weight of the evidence, the judge mistakenly excluded testimony and evidence about the involvement of the parties' eldest daughter in Sylvia's decision to file for divorce, and the award of counsel fees to Sylvia was erroneous. We find no merit in David's arguments, except we will vacate the counsel fee award and remand for further proceedings about Sylvia's entitlement to fees from David.

The parties were married in 1955. Sylvia is now in her mid-eighties, and David is over ninety. They have four children: Ellen, Nancy, Douglas, and

Jane, who were born in 1956, 1958, 1960, and 1964, respectively. The parties became extremely wealthy during their lengthy marriage, primarily through David's efforts as a real estate developer; Sylvia never worked outside the home. The parties' son Douglas works with David in his various businesses; the parties' three daughters did not.

Sylvia alleged that the parties' marital assets – exceeding $130 million in value – were controlled solely by David, providing as an example, that their West Orange home is titled in David's name. Sylvia, however, now has sole control over approximately $25 million in assets, including $14 million formerly held by the Sylvia Steiner Trust, which was transferred to her alone by agreement after commencement of this action.

In June 2018, Sylvia filed her complaint seeking a divorce from David. Over a year later, she moved to bifurcate the issues so that the court might first address whether there were grounds for divorce, which David disputed, before tackling their equitable distribution issues. On November 22, 2019, the Family Part's presiding judge granted the motion, and we soon after denied David's motion for leave to appeal that order.

The trial judge denied the parties' summary judgment cross-motions, which addressed whether there were grounds for divorce. Over the course of

A-2440-20

four nonconsecutive trial days starting in August and ending in December 2020, the judge heard testimony and, on January 19, 2021, rendered a written opinion and entered a judgment of divorce. Nine days later, the judge certified the judgment as a final appealable order, and David filed this appeal.

In appealing, David argues:

> I. THE TRIAL COURT'S JANUARY 19, 2021 FINAL JUDGMENT OF DIVORCE FINDING THAT SYLVIA DEMONSTRATED (A) IRRECONCIL- ABLE DIFFERENCES; AND (B) NO REASON- ABLE PROSPECT OF RECONCILIATION WAS AN ABUSE OF DISCRETION AND AGAINST THE WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT INCORRECTLY EXCLUDED RELEVANT TESTIMONY AND EVIDENCE NECESSARY TO APPROPRIATELY ASSESS THE EXTENT OF ELLEN'S INVOLVE- MENT IN THE DIVORCE LITIGATION.
>
> III. THE TRIAL COURT'S NOVEMBER 22, 2019 ORDER GRANTING BIFURCATION OF THE CAUSE OF ACTION FROM THE FINANCIAL ISSUES IN THE CASE WAS IMPROPER AND CONSTITUTED AN ABUSE OF DISCRETION.
>
> IV. THE TRIAL COURT'S AWARD OF COUNSEL FEES ABSENT AN EXAMINATION OF ALL FACTORS UNDER RULE 5:5-3[(c)] AND UPON ITS ERRONEOUS FINDING OF DAVID'S BAD FAITH WAS AN ABUSE OF DISCRETION AND UNDULY PUNITIVE.

For the following reasons, we reject David's first three points but agree in substantial part with his fourth.[1]

I

A

The Legislature has provided nine grounds on which a court may dissolve a marital partnership. See N.J.S.A. 2A:34-2. Subsection (i) provides the ninth ground, stating that a court may divorce a couple when "[i]rreconcilable differences . . . have caused the breakdown of the marriage for a period of six months and which make it appear that the marriage should be dissolved and that there is no reasonable prospect of reconciliation."

As David correctly asserts, no New Jersey court has attempted to describe the precise meaning of the phrase "irreconcilable differences." But there is no reason not to approach the matter as we would in seeking to understand the meaning of any statute; we must "read words and phrases in their context and apply their 'generally accepted meaning.'" N. Jersey Media

---

[1] We find insufficient merit in a fifth argument in which David argues that the trial judge "improperly relied on [the presiding judge's] dicta in reaching a determination of whether the parties had a reasonable prospect of reconciliation." We are satisfied that despite referring in her findings to what the presiding judge had said at the time he bifurcated the issues, the trial judge relied on her own view of the evidence. We find insufficient merit in this point to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017) (quoting N.J.S.A. 1:1-1). In so doing, we need not always rush off and consult dictionaries. It is better to consider what Judge Learned Hand famously wrote many years ago:

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.
>
> [Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945).]

The Legislature used plain but imprecise language, deliberately leaving it to our courts to determine when litigants have encountered differences that cannot be reconciled for the statutorily prescribed period.

Family judges know irreconcilable differences when they see them. And judges understand – as the Legislature likely did when it declined to provide greater detail in N.J.S.A. 2A:34-2(i) – that what constitutes an irreconcilable difference may vary from couple to couple. For one couple, differences may prove irreconcilable while not so for others possessing more forgiving personalities. See, e.g., Gazzillo v. Gazzillo, 153 N.J. Super. 159, 168-69 (Ch. Div. 1977) (finding the "[d]efendant's acts and attitudes, so objectionable to plaintiff, may well be the type of acts and attitudes that would hold together a

6

different marriage with a different partner"). Indeed, experienced family judges readily understand and would no doubt endorse the universal truth expressed by Tolstoy in <u>Anna Karenina</u>'s famous opening sentence: "All happy families are alike; each unhappy family is unhappy in its own way." By adopting an otherwise unexplained standard, the Legislature left it to the courts to ascertain what is irreconcilable on a case-by-case basis. We do not mean to suggest the legislative intent was to codify Tolstoy's writings, but it is fair to conclude that N.J.S.A. 2A:34-2(i) was crafted to provide just a concept, leaving it to family judges to ascertain when a particular couple's differences have become irreconcilable and when, beyond the six-month statutory period, it is no longer reasonable to expect a reconciliation.[2]

Having said all that, we must also recognize that divorce isn't available on mere request or demand. Only the Legislature is empowered to delineate grounds for a divorce. <u>Chalmers v. Chalmers</u>, 65 N.J. 186, 191 (1974). Even a

---

[2] Along these lines, David argues that the "period of six months" referred to in the statute in which the marriage has broken down must occur in its entirety prior to the filing of the divorce complaint. Sylvia argues that this interpretation is "logically absurd," as it would require a plaintiff who could demonstrate a six-month period of marital breakdown after the filing of the complaint, but prior to trial, to refile a complaint and "begin [her] litigation anew." We need not decide this issue because the evidence the judge found credible demonstrates that the parties' marital differences began more than six months prior to the complaint's filing in June 2018 and continued through the trial.

A-2440-20

"no fault" divorce requires more than the desire to divorce by imposing on the plaintiff an obligation to show the parties have lived apart for eighteen or more consecutive months, N.J.S.A. 2A:34-2(d), a condition that allows "divorcing spouses the time to reflect and discern if divorce is the appropriate action for them," Massar v. Massar, 279 N.J. Super. 89, 95 (App. Div. 1995). In short, the Legislature has adopted liberal grounds for citizens to end their marriages but statutory elements must still be demonstrated. Whatever ground is asserted must be proven by the party seeking a divorce. See Patel v. Navitlal, 265 N.J. Super. 402, 408 (Ch. Div. 1992). And, so, we turn to the evidence and the trial judge's findings.

B

At trial, both parties testified about the state of their marriage and Sylvia's claim of irreconcilable differences. Sylvia testified that she filed the divorce action because she did not "like being controlled by David" and had "never been treated as a partner." She explained that "it has not been a happy marriage" and that the time had come to end it. She testified she did not like how David treated their children and believed he unfairly favored their son, Douglas, over their three daughters, none of whom was allowed to work in the family businesses.

Sylvia testified that she objected to David making financial decisions without her knowledge or input, providing as examples David's $400,000 loan to a friend, and his giving properties and forgiving multimillion-dollar loans to Douglas. She also objected to the fact that David's will leaves two-thirds of his assets to Douglas and "a very small percentage" to the parties' three daughters. According to Sylvia, David treated her as if she were "not important" to him, he was never willing to "share[] control" over money, and she "always had to ask him for money." She testified that she did not object to this when she was "young and naïve and . . . didn't know any better," but that she had "evolved" and "now see[s] things very differently" than before.

Sylvia testified that she tried "many times" to convince David they should control their money "together," but David consistently refused, asserting: "I earned it, it's my money." He would respond to her entreaties with comments like, "you have plenty to eat, right?" This disturbed Sylvia, and she asked David to go to marriage counseling more than ten years prior to filing to divorce; he refused.

Sylvia claimed she had considered divorce "many times" but lacked confidence in herself. She described a physical altercation that took place approximately three years into the marriage – in the late 1950's – when David

"twisted [her] arm behind [her] back." Sylvia testified that she had experienced "many long years of being mistreated" and believed David's "lack of respect" for her continued up until the day she testified; she concluded that she was not happy enough in the marriage to stay in it.

Sylvia also testified that she and David lived separate lives though they continued to reside in the same house. They did not share meals together and, even before the pandemic and David's health issues, the parties only shared an "occasional dinner." She testified that, although the parties slept in the same bed until June 2020, "[t]here's no affection between us anymore. No touching." She explained that she "kept putting [] off" moving out of the bedroom because she had to buy a new bed and figure out how to move her elliptical machine out of her study to fit the bed, and there was no other spare bed in the house as David's aide had one of the spare bedrooms and the others were used for other purposes.

Sylvia testified that she had been "looking very seriously" for an alternative home and had narrowed her search but her own illness and David's suffering cardiac arrest led her to conclude that it "didn't feel right leaving [David] in the state he was in" because she "ha[d] a conscience" and "compassion" for him. In March 2020, Sylvia hired an architect to consult on a

10

plan to create a separate apartment for her over the garage in the marital home but ultimately decided not to proceed as she realized the apartment would be too dark and the staircase would be unsafe for her.

Sylvia also testified that she told family members and a couple of friends that she was getting divorced but not many other people, including other good friends, because she is a "private person" and "[i]t's embarrassing" and made her "uncomfortable" to share that news. She conceded she sent an email in December 2018 to the wife of a friend of David's, in which she described the divorce as "unconventional," that their "marital life will continue as it has for 63 years," and her "purpose" in seeking a divorce was "to learn about [David's] finances which has always been a big secret." But she explained that she did not know the recipient well and wrote the email to get the inquirer "to go away." She testified that she did not want her marital life to continue as before.

Sylvia also testified about her written communications with her granddaughter, who sent an email expressing she was "saddened and disappointed" about the divorce and that she did not think she could "personally handle talking to you and seeing you . . . without risking my mental health." Sylvia testified that she "felt terrible" about this and was so worried about the grandchild, who had already been traumatized by her own

11

parents' divorce, that she asked her daughter, Ellen, for help crafting a response, and sent the granddaughter an email expressing that the divorce would be "unconventional" and that

> Grandpa and I love each other very much. We had planned to continue living together and I would always take care of him as I do now. This does not have any effect on family life as you know it.

She referred in this email to the "economic" divorce another relative had with her second husband, and how "they lived together until he died." Sylvia testified that her statements in the email were "not honest" and were "white lie[s]" meant to "reassure" her granddaughter.

Sylvia also conceded that she wanted her grandchildren "to believe that [she and David] were going to love each other and take care of each other until the end of our days,"[3] but only to "reassure them." For that reason, she and David hosted a family dinner for their grandson in August 2018, and a breakfast after Yom Kippur the following month, to make it appear to the grandchildren as though nothing would change. When asked during cross-examination whether "during this case" she told David she was "going to be

---

[3] Although Sylvia testified this was a sentiment she wanted to convey to the grandchildren, the words contained in defense counsel's question, to which Sylvia agreed during cross-examination, actually come from an email David sent to their grandchildren.

12

with him forever[,]" Sylvia testified that she "might have said that, but I realize that it's not what I want for my future."

One of the issues David raises concerns whether Sylvia was voluntarily pursuing the divorce or whether strings were being pulled by others. In this regard, Sylvia testified the divorce was "strictly [her] idea"; she said it made her feel "very proud and strong and independent" and "was something [she] should have done many years ago." She denied that Ellen encouraged her to file for divorce, although she acknowledged Ellen, who is a lawyer, was both "helpful" in finding her a divorce lawyer and "ha[s] a personal interest in obtaining [her] rightful share of the estate for whatever purposes [she] wish[es]."

David testified that he did not want a divorce but "agree[d]" during cross-examination that he and Sylvia "now" have "irreconcilable differences." In fact, David conceded he had filed a counterclaim for divorce in which he certified he and Sylvia had irreconcilable differences, which had caused the breakdown of the marriage for a period of at least six months prior to the filing, and that "there was no reasonable prospect of reconciliation." He explained that this was "the way I felt . . . [a]t that time." In his testimony, David acknowledged that since filing his counterclaim, he and Sylvia

13

"continued to have significant disagreements" about money, control, his treatment of her, how their children are treated financially, and, specifically, his relationship with Douglas and treatment of Ellen. David repeatedly testified that the marriage was not "harmonious."

David also testified that Sylvia "harass[es]" him on "a regular basis," prompting him to seek a restraining order. He testified the harassment and abuse "continu[es] to this day" and is "making [him] sick." He testified that he needs "around-the-clock" help from his medical aides and sought relief from the court because Sylvia tried to fire his healthcare aides.

David asserted that Sylvia was "relentless" about his estate plan, disagreeing with him "morning, noon and night" because she "wants to tell me who I should leave my money to and how much." David rejected the suggestion that his money was also Sylvia's, stating: "She didn't earn it." He claimed he earned that money "despite her" and that he kept her out of the discussions about business "because she tells everybody in the world everything that goes on." He agreed Sylvia asked him "to tell her how much money" they had but he "refused to tell her," and that she asked him "to tell her what the plans were for how the children would be treated" in his estate plan and that he "refused to tell her" that too.

14

C

David argues in this appeal that the judge erred in finding grounds for a divorce because that determination was against the weight of the evidence and because the trial judge relied on the earlier ruling of the presiding judge in reaching that conclusion. We disagree.

The trial judge found Sylvia's testimony credible and "sincere when she testified that the issues of money and power and control in her marriage led her to seek a divorce." The judge found the parties' differences to be irreconcilable and that these differences had existed for at least six months prior to commencement of the divorce action. She also relied on the fact that David "agreed that irreconcilable differences existed for the statutory required period."

The judge found that "[b]oth parties substantially disagree" about David's control over the marital assets and his refusal to share control of their money throughout the course of the marriage. The judge also found that "[p]erhaps the most substantial disagreement" concerned "the treatment of their children" which was "evident with the parties' estate planning." The judge noted that David "made the unilateral decision to leave two-thirds . . . of the parties' marital estate to Douglas" and "chose not to discuss or notify [Sylvia]

15

of this decision," which "upset" Sylvia as she and her daughters believed they were being treated "unfairly." The judge further found that this conflict existed and continued throughout the time of trial and that both parties agreed they "do not have a harmonious marriage."

The judge rejected David's assertion that it was Ellen, not Sylvia, who wanted the divorce so that Ellen could inherit a greater share of the parties' marital assets. The judge also rebuffed the claim that Sylvia was not capable of handling her own matters, finding instead that Sylvia "appeared to be competent" and was capable of "answer[ing] all the questions asked of her with complete understanding" on both direct and cross-examination with "consistent" testimony "throughout the trial." The judge concluded that Sylvia "acted on her own volition in seeking a divorce."

The judge found that Sylvia sustained her burden of demonstrating irreconcilable differences without a reasonable prospect of reconciliation. The judge rejected David's argument that a reasonable prospect of reconciliation was demonstrated by evidence that Sylvia assisted David with medical care (before being enjoined from doing so), that the parties attended social gatherings together, that they made joint charitable donations, and that they continued to reside in the same household and, until June 2020, slept in the

16

same bed. The judge found Sylvia credible when she "clarified that she attended [such] functions with [David] mostly for the benefit of the parties' children and grandchildren." The judge also noted that these circumstances did not preclude the finding of this ground for divorce because, under New Jersey law, "parties may attempt to reconcile while seeking a divorce, but" a party seeking a divorce should not be penalized for "an unsuccessful attempt" at reconciliation. In this regard, the trial judge stated her agreement with the presiding judge's statement in granting bifurcation that "a party seeking a divorce does not need to be completely separated nor 'turn their back' on the other party" and "may still care or be involved in the other party's life but have no intention to remain married to him or her." We agree that both judges accurately described the law.

We also reject David's argument that the judge erred in finding Sylvia's testimony credible in the face of "overwhelming evidence that Sylvia admittedly did not intend to separate from [him] or end their relationship." He argues that the evidence demonstrates the divorce action is a "sham" and the result of collusion between Sylvia and Ellen so that Ellen might wrest a greater percentage of the parties' estate while David lived than she would otherwise be

17

entitled by operation of David's will on his death.[4] That there is evidence that would have permitted such a finding does not mean the judge was required to credit it.

The scope of appellate review of a judge's fact findings "is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). A judge's findings are "binding on appeal when supported by adequate, substantial, credible evidence," Gnall v. Gnall, 222 N.J. 414, 428 (2015); Cesare, 154 N.J. at 411-12, because it is the trial judge who "hears the case, sees and observes the witnesses, [and] hears them testify," thereby possessing "a better perspective than a reviewing court in evaluating the veracity of witnesses," Pascale v. Pascale, 113 N.J. 20, 33 (1988).

Deference is particularly warranted "when the evidence is largely testimonial and involves questions of credibility." In re J.W.D., 149 N.J. 108, 117 (1997). Moreover, we defer to "family court factfinding" because "of the family courts' special jurisdiction and expertise in family matters," Cesare, 154 N.J. at 413, so that, "[i]f the trial court's conclusions are supported by the evidence, we are inclined to accept them," Gnall, 222 N.J. at 428.

---

[4] David has since executed a new will that disinherits Sylvia.

It may be that a judge would be entitled to deny a divorce on finding that another family member or stranger had unduly influenced one of the marital partners to seek that relief. But we need not resolve that question because the judge found from her consideration of the evidence that this had not occurred and that the decision to seek the divorce was Sylvia's. The judge was also entitled to find from the evidence she found credible that the parties had irreconcilable differences for more than six months with no reasonable prospect of reconciliation. David has provided no principled reason for our intervention or second-guessing of the judge's findings and conclusions.

II

David argues that the judge erred in excluding testimony relevant to Ellen's involvement in this matter. While we agree evidence about the involvement of others is relevant when considering whether a party seeking a divorce has been unduly influenced, the record does not reveal that David was unduly limited in presenting such evidence.

That is, David asserts that "[o]n numerous occasions throughout trial, the trial court prevented or otherwise precluded testimony of the issue of Sylvia's motive behind her [c]omplaint for [d]ivorce." We find little or no support for the premise of this assertion. Those portions of the trial transcript to which

19

David refers reveal that the judge did question the relevance of the defense's line of questioning about Ellen's involvement in Sylvia's decision to file for divorce, but the judge permitted defense counsel to ask several questions on this topic. Indeed, in the transcript pages to which David refers, defense counsel was only precluded from asking a single question: "Ellen didn't tell you that she cared about whether your other two daughters were getting enough, just herself, correct?" Considering the question's multiple parts, it is not clear to us how David's being deprived of an answer to that question resulted in a "manifest denial of justice." Rowe v. Bell & Gossett Co., 239 N.J. 531, 551-52 (2019) (citations omitted).

Although the judge did express a view that "[t]his isn't an estate litigation" and the question to be decided "is whether or not [Sylvia] is going to get a divorce," there is nothing about the judge's rulings that revealed a limitation on the defense's examination into whether Ellen was unduly influencing Sylvia in this litigation. Moreover, even if the record could be interpreted as David argues, he did not ask to "make a specific offer of what is expected to be proved by the answer of the witness," R. 1:7-3, thereby depriving us of an opportunity to ascertain the effect of the exclusion of further evidence in this area.

20

We are satisfied that inquiry into Ellen's alleged involvement in Sylvia's decision-making was relevant, but we are also satisfied that David was not prevented from pursuing that area of inquiry. For example, defense counsel asked Sylvia whether: she was "pressuring [David] to pay Ellen's bills[,]" which Sylvia denied; whether Ellen told Sylvia "that she was upset because she believed that Doug was getting more from the estate . . . than she[,]" which Sylvia conceded; whether "Ellen told [Sylvia] that a divorce could fix her problems as it relates to the estate[,]" which Sylvia denied; whether "Ellen was involved in this case as early as the complaint for divorce[,]" which Sylvia denied; whether an email from Ellen to David about her differences with Douglas was sent "approximately a month before [Sylvia] filed for divorce," which Sylvia conceded; whether Ellen helped Sylvia find her divorce attorney, which Sylvia conceded; and whether Ellen helped prepare the divorce complaint, which Sylvia denied. Numerous exhibits relating to Ellen, including emails between Ellen and one or both of the parties, text messages between Ellen and Sylvia, as well as large portions of Ellen's deposition testimony, were admitted.

21

Because the judge did not preclude David from eliciting testimony to support his claim that Ellen unduly influenced Sylvia in seeking a divorce, we reject this point of David's appeal.

### III

David argues that the presiding judge abused his discretion in ordering bifurcation under Rule 5:7-8. We find no merit in this argument.

To be sure, the bifurcation of issues in a divorce action is unusual. But Rule 5:7-8 permits bifurcation with the admonition that it should "be granted only in extraordinary circumstances and for good cause shown." The presiding judge found good cause in that the parties are elderly and, as a result, there remained a potential for the type of problems recognized in Carr v. Carr, 120 N.J. 336 (1990). Indeed, bifurcation was in the interest of judicial economy; if David's position on the grounds for divorce was sustained, there would be no need to ever deal with the parties' considerable economic issues; a trial on those issues would undoubtedly dwarf the size of the trial on the cause of action. The presiding judge recognized this when he observed it would be "particular[ly] inequitable and extremely time-consuming and extremely emotional[ly] draining and perhaps even debilitating to the health and well-being of these parties . . . to require the parties to go through that monumental

22

[discovery] work" given the large size of the parties' estate, if Sylvia failed to prove a ground for divorce.

The decision rested in the presiding judge's sound discretion. See Thompson v. Merrell Dow Pharm., Inc., 229 N.J. Super. 230, 255 (App. Div. 1988). "When examining a trial court's exercise of discretionary authority," we "reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 174 (App. Div. 2011) (quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

The presiding judge correctly recognized that with a genuine dispute about the existence of grounds for divorce, it would have been uneconomical to allow for discovery or a trial on a host of economic issues that would ultimately have been rendered moot if David prevailed on whether there was a cause of action. For that substantial reason, we conclude the judge did not abuse his discretion in bifurcating the issues and therefore there is no need to reach the parties' other arguments about the so-called Carr "black hole" that the parties may or may not find themselves in the future.

A-2440-20

IV

David lastly argues that the judge erred in awarding $229,711.25 in fees to Sylvia. For the following reasons, we vacate the fee award and remand for further consideration.

In determining grounds existed for an award, the judge referred to the factors set forth in Rule 5:3-5(c). Of note, the judge recognized that, although the marital assets had not been fully evaluated, "[the parties'] assets exceed $100 million," and both parties were "more than capable of paying the cost of their own counsel fees" notwithstanding the allegation that David "controls most of the parties' assets." The judge found that Sylvia had incurred $853,864 in counsel fees as of May 31, 2020, and David had incurred $803,801.37 as of October 13, 2020.

The judge's ruling, despite Sylvia's wealth and clear ability to pay her own fees, turned on what the judge deemed to be David's "bad faith." See R. 5:3-5(c)(3) (allowing for consideration of "the reasonableness and good faith of the positions advanced by the parties both during and prior to trial"); N.J.S.A. 2A:34-23 (allowing a court to award counsel fees in a divorce action and requiring that the court "consider the factors set forth in the court rule on counsel fees, . . . [including] the good or bad faith of either party"). This

24

finding of bad faith was based on David's position on the merits of Sylvia's claim of grounds for divorce. We interpret the judge's heavy reliance on this factor as demonstrating all other factors either weighed against such an award or were entitled to little or no weight. In essence, we discern from the judge's decision that fees were awarded to Sylvia because David sought to preserve a sixty-five-year marriage rather than give in to Sylvia's desire for a divorce. The judge said as much, finding that:

> [David] exhibited bad faith during the trial. [He] steadfastly maintained the opinion that there were no irreconcilable differences in the parties['] marriage and as a result, the cause of action portion of this matter had to proceed to trial.

The bad faith of a matrimonial litigant does not arise merely because that litigant failed at a trial on the merits. It requires that the party against whom fees are sought acted beyond the bounds of proper advocacy by pursuing a claim or defending against a claim without factual support. To be sure, the judge found against David on the issues presented in the bifurcated trial. The judge, in fact, may have found the evidence tilted heavily toward Sylvia's view of the marriage, but that view of the evidence alone does not support a finding of bad faith. That a factfinder sees the evidence differently than a litigant does not demonstrate that the losing litigant acted in bad faith.

25

Moreover, the award itself, which predominantly incorporated only the fees expended in preparation for and during the four-day trial hardly suggests that David's opposition was so weak as to support a finding that he acted in bad faith, as seems to be the judge's view. The judge concluded that it was reasonable for Sylvia to incur $229,711.25 in fees to combat David's inessential response to her cause of action – a conclusion that simply does not compute. If it was so obvious that David had not a leg to stand on in countering Sylvia's claim of irreconcilable differences, why did it cost so much to sustain Sylvia's claim? If there is a good answer to that question, it is not revealed in the trial judge's written decisions[5] on the counsel fee issues.

We are mindful that part of the judge's finding of bad faith was based on David taking certain steps to avoid the day of reckoning on the cause of action. The judge found that David

> vigorously engaged in delaying the commencement [of the] cause of action trial. Particularly, [David] insisted that this [c]ourt not go forward with the trial after in-person court proceedings were ceased due to the ongoing pandemic of COVID-19. However, the New Jersey Supreme Court issued directives for trials to go forward virtually and therefore, this [c]ourt scheduled the cause of action trial to commence through the

---

[5] The judge filed two opinions. The first contained the judge's findings on why the rule-based factors permitted an award in Sylvia's favor, and the second quantified the amount awarded.

> virtual Zoom platform. Despite this [c]ourt's decision to go forward with the cause of action trial, [David] filed an emergent application two . . . days before trial to halt the trial.

To the extent David took unreasonable positions designed to delay the proceedings, the judge was certainly entitled to require that he reimburse Sylvia for her costs in combatting those unreasonable positions. But the judge's decision does not reveal the cost to Sylvia of pursuing a favorable ruling from the trial judge on the rejection of David's attempts to halt or delay the trial.

We conclude that, without a more compelling showing of bad faith, David was entitled to defend against Sylvia's claim of irreconcilable differences without having to bear the cost of being wrong. Because the other principal factors – the ability to pay and the need for an award – weigh heavily against a fee award, we conclude that the judge abused her discretion in awarding fees to Sylvia for all her attorneys' services in preparing for or participating in the four-day trial. Instead, in recognizing David may have taken certain bad faith steps, like that quoted above when he sought to delay the trial, we remand for further consideration of Sylvia's application for fees on those discrete matters.

A-2440-20

We vacate the award of fees but remand for the judge's consideration of whether or to what extent David unreasonably attempted to erect obstacles to delay or frustrate the court's conducting of the trial.

* * *

Affirmed in part, vacated in part, and remanded. With this disposition, we vacate our stay of the trial court's October 7, 2021 order.[6] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] Shortly before this matter appeared on our plenary calendar, we entered an order that stayed a trial court order – issued during this appeal's pendency – that purported to enforce litigant's rights and that compelled a turnover of discovery, among other things. We did not explain the reasons for our order. Sylvia moved for this court to set forth the reasons for granting the stay. Although we see no merit in Sylvia's motion for an explanation – this court hears thousands of motions every year and it expects too much that we explain each of those rulings – it should be readily apparent that we granted the stay not only because with the filing of an appeal it is the appellate court that controls the litigation, R. 2:9-1(a), but also in the interest of judicial economy – the same judicial economy that supported Sylvia's position on bifurcation. We are of course mindful of the fact that while the appellate court maintains "supervision and control of the proceedings," ibid., trial courts remain authorized to enforce unstayed orders. But, considering the imminence of our decision on the merits of the appeal and the likelihood that if we ruled in this appeal in David's favor, much if not all of the relief contained in the trial court's order would have been rendered moot, we deemed it more appropriate to completely halt the proceedings in the trial court until disposition of this appeal. These few comments may serve as our explanation for the entry of our November 16, 2021 order staying the trial court's October 7, 2021 order.

A-2440-20